**AL-JON, INC., Appellant,**

v.

**GARDEN STREET IRON & METAL, INC., Appellee.**

No. 65204.

Supreme Court of Iowa.

Feb. 18, 1981.

Richard C. Bauerle of Johnson, Bauerle & Hester, Ottumwa, for appellant.

Dennis W. Emanuel of Webber, Gaumer & Emanuel, Ottumwa, and Robert L. Rinear of Ahlrichs, Murdock & Rinear, Cincinnati, Ohio, for appellee.

Considered by LeGRAND, P. J., and UHLENHOPP, HARRIS, McCORMICK, and ALLBEE, JJ.

McCORMICK, Justice.

The question here is whether the nonresident defendant corporation had sufficient contacts with Iowa to permit our courts to acquire personal jurisdiction over it. The trial court sustained defendant's special appearance after finding defendant did not have "the necessary minimum contact with the State of Iowa" to subject it to jurisdiction under Iowa R.Civ.P. 56.2 and the governing due process stricture. We affirm.

■ Jurisdiction under rule 56.2 is coextensive with what is permitted by the due process clause of U.S.Const. amend. XIV. *Larsen v. Scholl*, 296 N.W.2d 785, 788 (Iowa 1980). Therefore the only relevant issue is whether in this case personal jurisdiction over the nonresident defendant is consistent with due process. Controlling principles are delineated in *Larsen* and need not be fully repeated here. *See id.* at 787–88.

Because due process is infringed unless the defendant has had sufficient minimum contacts with Iowa, we must determine whether the contacts were sufficient in the present facts. In doing so, we consider:

(1) the quantity of the contacts;

(2) the nature and quality of the contacts;

(3) the source of and connection of the cause of action with those contacts;

(4) the interest of the forum state; and

(5) the convenience of the parties.

*Id.* at 788. The first three factors are most important.

■ The trial court findings of fact have the force of a jury verdict, and plaintiff accepts them as true for purposes of this appeal. Those findings were as follows:

Plaintiff [Al-Jon, Inc.] is an Iowa corporation with its principal place of business in Ottumwa, Iowa. It engages in the manufacture and sale of recycling equipment and maintains a manufacturing plant at the Ottumwa Industrial Airport.

Defendant [Garden Street Iron & Metal, Inc.] is a foreign corporation with its place of business being in Cincinnati, Ohio.

In the fall of 1978, a representative of plaintiff who resided in Michigan contacted defendant several times in Cincinnati, Ohio, in an effort to sell a 550 Shear Baler. The president of defendant corporation was advised that after he signed a purchase agreement and made a down payment plaintiff would commence manufacturing the "baler" at its plant in Ottumwa, Iowa. As a part of the solicitation, plaintiff flew its aircraft from Ottumwa, to Cincinnati, Ohio, picked up two employees of defendant, and flew them to Arkansas and Missouri to see the equipment in operation. There is no evidence "the baler" was specially designed only for defendant.

The solicitation of defendant by plaintiff's representative resulted in defendant purchasing the "baler" and executing a purchase agreement ... and a conditional sales contract .... The purchase agreement provided for a $10,000 down payment and an additional $39,700 to be paid on delivery with the balance due in the amount of $75,000 to be paid under a retail installment contract. The agreement also provided for delivery F.O.B. Cincinnati, Ohio, and contained a statement that any disputes would be governed by the law of Iowa. Plaintiff assigned the conditional sales contract to ITT Industrial Credit Corporation with recourse. Both of the documents were signed by defendant in Cincinnati, Ohio, and accepted by plaintiff in Ottumwa. In addition to signing the documents, defendant gave plaintiff's representative a check for $10,000 in Cincinnati as a down payment.

The 550 Shear Baler was manufactured by plaintiff at its plant in Ottumwa and delivered to defendant in Cincinnati on February 14, 1979. Upon delivery, defendant paid the balance of $39,700 under the purchase agreement and made [its] conditional sales contract payments to ITT. Prior to this time, defendant made a couple of telephone calls to plaintiff in Ottumwa to check on the date of delivery.

Subsequent to the baler being delivered, defendant made many telephone calls to plaintiff in Ottumwa relative to repair of the machine as defendant apparently had some difficulty with it. During this period of time, plaintiff shipped numerous parts for the machine from Ottumwa to Cincinnati with some of them being sent back for credit. The invoices concerning the parts contained a statement that the agreement would be governed by the laws of Iowa .... In addition, at the request of defendant, plaintiff sent several of its employees to Cincinnati to perform work on the machine.

In June 1979, defendant requested that plaintiff perform substantial repair warranty work on the machine, and plaintiff informed defendant that it would be necessary for the machine to be returned to plaintiff's plant in Ottumwa. Due to the difficulties with the machine, plaintiff went and picked up the machine and returned it to plaintiff's plant in Ottumwa where substantial modifications were made. After this was completed, the machine was delivered back to defendant in Cincinnati.

The parties were still having problems with the machine, and at the request of defendant, plaintiff agreed to replace a hydraulic cylinder which is manufactured by a company in Hampton, Iowa. Pursuant to request by plaintiff, an employee of defendant picked up the replacement hydraulic cylinder in Hampton and returned it to Cincinnati.

In January, 1980, defendant contacted plaintiff complaining [it was] still having problems with the machine and that no more payments would be made to ITT. The parties then agreed that plaintiff could take possession of the machine and resell it in order to apply the proceeds to their sale. Defendant also claimed that plaintiff agreed to refund the money paid on the machine. Thereafter, plaintiff picked up the machine in Cincinnati and returned it to Ottumwa where the machine was refurbished and sold to another of plaintiff's customers.

This litigation ensued with plaintiff taking the rather novel approach of filing a petition for declaratory judgment alleging in substance that it owes defendant some money but that defendant is claiming more than what plaintiff feels is owed. The petition alleges there is a controversy as to the amount of debt due plaintiff from defendant and the amount of credit to which defendant in entitled against the debt. Plaintiff served notice on defendant personally in Cincinnati, Ohio, pursuant to R.C.P. 56.2.

Thus the Iowa plaintiff and Ohio defendant entered a conditional sales contract which was solicited in Ohio by plaintiff. The contract was to be governed by Iowa

law. The baler was a standard product which was manufactured in Iowa and delivered to defendant in Ohio. The only subsequent contacts by defendant with Iowa related to obtaining repair parts and service. The repair work was done in Ohio except for one occasion when plaintiff found it necessary to return the baler to Iowa in order to rebuild it. Under the court's findings, plaintiff ultimately repossessed the machine in Ohio pursuant to the contract, albeit peacefully, and unilaterally pursued its contract and statutory remedies in Iowa.

In determining whether these contacts are a sufficient predicate for personal jurisdiction in Iowa, we are guided by prior cases which arose from contractual relationships. *See Universal Cooperatives, Inc. v. Tasco, Inc.*, 300 N.W.2d 139 (Iowa 1981); *Berkley International Co. v. Devine*, 289 N.W.2d 600 (Iowa 1980); *Kagin's Numismatic Auctions, Inc. v. Criswell*, 284 N.W.2d 224 (Iowa 1979); *De Cook v. Environmental Security Corp.*, 258 N.W.2d 721 (Iowa 1977); *Douglas Machine & Engineering Co. v. Hyflow Blanking Press Corp.*, 229 N.W.2d 784 (Iowa 1975); *Rath Packing Co. v. Intercontinental Meat Traders, Inc.*, 181 N.W.2d 184 (Iowa 1970); *Miller v. Vitalife Corporation of America*, 173 N.W.2d 91 (Iowa 1969). Jurisdiction was upheld in all of these cases except *Rath*. However, all of the cases except *Kagin's* and *Rath* are easily distinguished from the present case by the quality or quantity of contacts involved.

*Kagin's* involved a contract made in Florida between Kagin's, an Iowa corporation with its principal place of business in Polk County, and Criswell, a Florida resident. The contract required Kagin's to prepare Criswell's coin collection for auction sale to be conducted by Kagin's in Atlanta four months later. Criswell shipped the coins to Iowa where Kagin's prepared them for sale and held them in Iowa until the sale was held. The contacts with Iowa were:

> Criswell communicated by telephone with Kagin's Iowa address while negotiating the contract; Criswell shipped the Sutler currency to Iowa; Kagin's took receipt of the coins in Iowa and sent Criswell its

cash advance from Iowa; Kagin's prepared the coins in Iowa for sale; the catalogue contemplated by the contract was prepared and printed in Iowa; and Criswell's coins were held in Iowa, at Kagin's risk, until the Georgia sale.

284 N.W.2d at 228. This court found that by sending his goods into Iowa to be held at the risk of an Iowa business, Criswell purposely availed himself of the privilege of conducting activities in Iowa, thereby invoking the protections of Iowa law. The court also found that under the five-factor analysis, Iowa's assertion of jurisdiction met the requirement of fair play and substantial justice.

*Rath* involved a contract made through an Illinois middleman by Rath, a Waterloo meatpacking business, and Intercontinental Meat Traders, an Illinois corporation. Upon receiving orders from the middleman, Rath loaded pork skins on rail cars in Waterloo, obtained a bill of lading from the carrier and sent it with a sight draft to Traders' Chicago bank. Traders paid the draft and received the bill of lading entitling it or its consignee to take possession of the shipment. Rath twice shipped skins for temporary storage at Iowa locations for its own convenience. When Traders' customers complained about the quality of pork skins it was receiving, Traders passed the complaints on to Rath through the middleman. Traders also wrote complaint letters to Rath. On one occasion, at the middleman's suggestion, Traders' president made a one-day visit to Iowa to inspect pork skins and confer with a Rath official in an effort to resolve the problem. 181 N.W.2d at 186.

Among other findings, this court said the fact Rath was a resident seller seeking to obtain jurisdiction over a nonresident purchaser was a significant factor in considering the sufficiency of the nonresident's contacts with Iowa. More substantial impact on Iowa and a greater state interest in protecting citizens of this state will ordinarily be implicated when the contacts involve a product brought into the state. *Id.* at 188–89. Another reason is "that the seller is usually the aggressor or

initiator in the forum and by selling his product in the state he receives not only a profit but the benefit and protection of the forum state's laws." *CMI Corp. v. Costello Construction Corp.*, 454 F.Supp. 497, 503 (W.D.Okla.1977). In addition to these considerations, we must apply the same standard of fairness to nonresident purchasers that we would expect to be applied in foreign jurisdictions to Iowa purchasers. *Rath*, 181 N.W.2d at 189.

■ What is fair to one nonresident purchaser may not be fair to another. A distinction exists between a nonresident purchaser who aggressively seeks a purchase from the resident seller and one who merely responds to solicitation by the resident seller. *Yankee Metal Products Co. v. District Court*, 528 P.2d 311, 312–13 (Okl.1974). This results in an "active-purchaser" and "passive-purchaser" classification:

> Thus in applying the "minimum contacts" rule, there is a rational distinction to be made between an out-of-state purchaser who aggressively solicits a business transaction and participates in some way in the production of the subject goods, and one whose business is solicited and "who simply places an order and sits by until the goods are delivered."

*Gladding Corp. v. Balco Pedrick Parts Corp.*, 76 A.D.2d 1, 5, 429 N.Y.S.2d 940, 943 (1980).

■ A passive purchaser is less likely to be found to have availed itself purposely of the privilege of doing business in the forum state. This is illustrated by the reasoning of the court in *M & D Enterprises v. Fournie*, 600 S.W.2d 64, 69 (Mo.App.1980):

> The flow of commerce was initiated by M & D, by its contact with Fournie in Illinois. M & D sought out Fournie in Illinois, and through aggressive solicitation, sold its product to Fournie. To permit Missouri courts to have jurisdiction in this case would amount to an open invitation to Missouri residents to go into other states, solicit business as an aggressor, and then, as a practical defense to any claim asserted by a nonresident buyer that the product sold was defective, drag

the buyer into Missouri courts, as a strategic counter-move.... Such a practice would violate the traditional notions of fair play and substantial justice, as mandated by *International Shoe.*

Similar reasoning was employed in analogous facts in *McQuay, Inc. v. Samuel Schlosberg, Inc.*, 321 F.Supp. 902, 906–07 (D.Minn.1971). Unless defendant's activities in attempting to have the baler repaired and cooperating with plaintiff's efforts to carry out warranty obligations require a different characterization, defendant could not be considered an active purchaser in the present case.

■ We are persuaded that defendant's contacts with Iowa are more closely analogous to those in *Rath* than those in *Kagin's*. As in *Rath* the contract involved purchase of a product for shipment out of state. The transaction might have ended with the purchase if the product had not broken down. Defendant's telephone calls to plaintiff concerning repairs are not materially different from the letters in *Rath*. Permitting plaintiff to return the baler to Iowa for rebuilding and sending a truck here to pick up a cylinder do not differ qualitatively or quantitatively from Trader's president's visit to Iowa to inspect pork skins and visit with the Rath official. Plaintiff's ultimate repossession of the baler was not resisted by defendant, but that fact does not alter the unilateral character of that activity. Nor does the choice of law provision in the contract require defendant to submit to jurisdiction in Iowa. *See Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583, 588 (2nd Cir. 1965).

■ In contrast to the situation in *Kagin's*, defendant did not make telephone calls to Iowa to negotiate the contract. Nor did the contract involve shipping a product into Iowa for a service to be performed here or for the product to be held here for the nonresident. Thus, unlike Criswell, defendant did not send goods into Iowa to be held at the risk of an Iowa business, thereby invoking the protection of Iowa law. Defendant simply purchased a standard product which was manufactured

in Iowa. The manufacturing of the baler and sending of repair parts were unilateral acts by plaintiff. *See CMI Corp.*, 454 F.Supp. at 504. Plaintiff's taking of the baler to Iowa on one occasion for warranty work was for the convenience of plaintiff in performing its warranty obligation. This was also a unilateral act. *See Premier Corp. v. Newsom*, 620 F.2d 219, 223 (10th Cir. 1980).

■ Considering all the relevant factors, we believe maintenance of this suit in Iowa would offend traditional notions of fair play and substantial justice. The trial court did not err in sustaining defendant's special appearance.

AFFIRMED.