**HOOVER'S HATCHERY, INC.,
Plaintiff–Appellant/Cross–Appellee,**

v.

**Stuart UTGAARD d/b/a Utgaard's
Hatchery, Defendant–Appellee/
Cross–Appellant.**

**No. 88–634.**

Court of Appeals of Iowa.

Aug. 23, 1989.

Mark W. Fransdal and Robert J. Dieter of Redfern, McKinley, Mason & Dieter, Cedar Falls, for plaintiff-appellant/cross-appellee.

Thomas D. Bell of Doar, Drill & Skow, New Richmond, Wisconsin, and Richard J. Bell of Bell & Vilsack, Mount Pleasant, for defendant-appellee/cross-appellant.

Heard by DONIELSON, P.J., and HAYDEN and HABHAB, JJ.

DONIELSON, Presiding Judge.

The parties are both operators of chicken hatcheries. Hoover's Hatchery (plaintiff-appellant) is in Iowa, while Utgaard's Hatchery (defendant-appellee) is in Wisconsin. Bob Hoover is board chairperson of Hoover's Hatchery, Inc., and Stuart Utgaard owns Utgaard's Hatchery.

In the spring of 1984, Bob Hoover told Stuart Utgaard that he might be interested in selling Hoover's Hatchery. Utgaard expressed interest and inspected Hoover's physical operation. No decision on a sale

was made at that time because Hoover's Hatchery would not make financial statements available to Utgaard.

In June 1984 Hoover and Utgaard entered into negotiations which were directed at allowing Hoover's Hatchery to become the chick supplier for Utgaard's Hatchery during the 1985 hatching season. Hoover believed the parties reached an agreement calling for Hoover's Hatchery to provide substantially all of Utgaard's chick requirements for 1985. The precise number of chicks in question was never specified, apparently because the market could not be determined much in advance. Utgaard made various estimates to Hoover of the number of chicks he would want. Initial estimates were that Utgaard would purchase over 400,000 chicks from Hoover's Hatchery. Hoover prepared to produce chicks in accordance with those estimates. Hoover's preparations included increasing its egg orders from its suppliers and securing space at another hatchery to accommodate the volume of Utgaard's order.

Correspondence from Utgaard to Hoover's in December of 1984, indicated that Utgaard would be purchasing only 270,000 chicks from Hoover's. Utgaard provided Hoover's with a revised "set" plan to accommodate this decrease. Subsequent revised set plans were received in February and April of 1985.

When the 1985 hatching season actually arrived, Utgaard took far fewer chicks from Hoover than any of the estimates had contemplated. In addition, Utgaard produced in its own hatchery a very substantial number of the chicks it wanted for the 1985 season; this was contrary to Hoover's understanding of the agreement.

Because Utgaard ordered far fewer Hoover chicks than Hoover had expected, Hoover found itself with hundreds of thousands of chicks on hand which it could not readily sell. Some of the chicks were sold at distress prices, but about 248,000 chicks were killed.

Following these events, Utgaard made new inquiries about purchasing Hoover's Hatchery.

Bob Hoover believes that Utgaard deliberately misled him about the number of chicks Utgaard would order from Hoover, thereby causing Hoover to overproduce and incur consequent losses. Bob Hoover believes Utgaard did this in order to drive down the purchase price of Hoover's Hatchery.

Hoover filed suit against Utgaard, stating theories of breach of contract, fraud, negligent misrepresentation, promissory estoppel, and equitable estoppel. The suit was tried to the court. At the conclusion of Hoover's evidence, the district court dismissed Hoover's fraud claim for insufficiency of the evidence to generate a fact question. At the conclusion of all the evidence, the district court concluded that Utgaard had breached a "requirements contract," as defined in Iowa Code section 554.2306. The district court determined that Hoover's Hatchery had suffered losses totaling $70,529. However, the court also determined that Hoover's Hatchery had failed to mitigate its damages; therefore, the court awarded Hoover's Hatchery only 30% of its total damages, or $21,158.77.

Hoover's Hatchery has appealed from the district court's judgment, and Utgaard has cross-appealed.

Hoover's Hatchery contends the district court erred by dismissing its fraud claim. Hoover's Hatchery contends its evidence was sufficient to create a question of fact on fraud. Hoover's Hatchery also challenges the sufficiency of the evidence to establish that it failed to mitigate its damages. In addition, Hoover's Hatchery contends the district court erred by allegedly using a comparative fault analysis to determine damages in a case arising primarily from contract theories.

In its cross-appeal, Utgaard's challenges the sufficiency of the evidence to establish that the parties had entered into a "requirements contract" as defined in Iowa Code section 554.2306. Because it disputes the existence of such a contract, it also argues that Hoover's Hatchery suffered no compensable damages at all.

Finally, Utgaard's (a Wisconsin resident) contends the district court erred by holding

that it had personal jurisdiction over it. It argues that it lacked sufficient minimum contacts with Iowa to confer jurisdiction on Iowa courts. It asserts that in its dealings with Hoover's Hatchery, it was merely a "passive purchaser" because Hoover had initiated all contacts and had actively sought Utgaard's participation. Utgaard argues that its role as "passive purchaser" was not sufficient to confer jurisdiction on Iowa's courts.

Our review of this action at law is on assigned error. Iowa R.App.P. 4. The findings of fact of the trial court have the effect of a special verdict. *Id.* The findings are binding upon this court if they are supported by substantial evidence. Iowa R.App.P. 14(f)(1).

## I. *Jurisdiction*

■ In resolving jurisdictional questions regarding nonresidents, the courts are to employ a two-prong test: first, does a statute authorize assumption of jurisdiction of the defendant, and second, would assumption of jurisdiction offend constitutional due process of law? *Martin v. Ju-Li Corp.*, 332 N.W.2d 871, 874 (Iowa 1983). Section 617.3 of the Code of Iowa authorizes personal jurisdiction over a nonresident defendant who has entered into a contract "to be performed in whole or in part by either party in Iowa...." Defendant concedes that it contracted to purchase chicks from plaintiff and that the first prong is satisfied. Defendant challenges the trial court's finding that it had sufficient minimum contacts with Iowa, and asserts that traditional notions of fair play and substantial justice were offended by the court's jurisdiction of this matter.

Due process is infringed unless defendant has had sufficient minimum contacts with Iowa. In determining whether the contacts were sufficient, this court must consider the following:

(1) the quantity of the contacts;
(2) the nature and quality of the contacts;
(3) the source of and connection of the cause of action with those contacts;
(4) the intent of the forum state; and

(5) the convenience of the parties. *Al-Jon, Inc. v. Garden St. Iron & Metal,* 301 N.W.2d 709, 711 (Iowa 1981). The first three factors are the most important. *Id.* The minimum contacts test is not susceptible to mechanical application; rather, the facts of each case must be weighed to determine whether the requisite affiliating circumstances are present. *Larsen v. Scholl,* 296 N.W.2d 785, 788 (Iowa 1980), *citing Hanson v. Denckla,* 357 U.S. 235, 246, 78 S.Ct. 1228, 1235, 2 L.Ed.2d 1283, 1293 (1958). "[T]his determination is one in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable." *Larsen,* 296 N.W.2d at 788, *citing Estin v. Estin,* 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561, 1566 (1948).

Defendant asserts that it was merely a "passive purchaser" of plaintiff's goods and that it wasn't subject to the trial court's jurisdiction in this case. While Iowa courts have recognized a stronger interest in seeing that their jurisdiction extends to nonresident sellers as opposed to nonresident purchasers, *Al-Jon, Inc.,* 301 N.W.2d at 713-14, this does not preclude the courts' jurisdiction from extending to nonresident purchasers who may be characterized as "active" purchasers. *Id.* at 714.

The trial court found that defendant played an active role in the negotiations of an agreement with plaintiff. Defendant had a role in determining the number of eggs to be set by plaintiff and in establishing the time frame for setting the eggs. Correspondence between the parties reveals that defendant later suggested that reductions should be made in the egg setting plans. The trial court concluded that this was not "a standard sale of a standard product" and that defendant's ongoing and active participation in plaintiff's production of the chicks constituted sufficient minimum contacts to warrant jurisdiction in this case.

Defendant's requests for the custom hatching of specific types and numbers of chicks removed this case from the realm of passive purchasing to that of active purchasing. The Iowa Supreme Court has im

plicitly recognized the distinction between purchases of standard products by nonresident purchasers and the purchase of custom-ordered items. In *Al-Jon, Inc.*, 301 N.W.2d at 711, the court noted that jurisdiction over an out-of-state purchaser did not exist where there was no evidence that the purchased baler "was *specially designed* only for the defendant" (emphasis added).

The record in this case reveals that defendant actively participated in negotiations and plans for production. *See Yankee Metal Products Co. v. District Court*, 528 P.2d 311, 312–13 (Okla.1974), cited with approval in *Al-Jon*, 301 N.W.2d at 714. Defendant specified certain types and amounts of chickens that it would purchase. Plaintiff modified its hatching plans to accommodate defendant's specific requests. This conduct demonstrates that defendant was more than merely a passive purchaser. Defendant's conduct in this case constitutes sufficient minimum contacts with Iowa to support jurisdiction of the matters raised in this case; the trial court did not err in assuming jurisdiction.

## II. *Fraud*

■ Plaintiff appeals the trial court's dismissal of its claim for fraud. In considering the propriety of a motion for a directed verdict, the court views the evidence in the light most favorable to the party against whom the motion was made. Iowa R.App.P. 14(f)(2). The movant is considered to have admitted the truth of all evidence offered by his adversary and every favorable inference which may be fairly and reasonably deduced from it. *Beitz v. Horak*, 271 N.W.2d 755, 757 (Iowa 1978). To grant a directed verdict, a trial court must find that the evidence is insufficient as a matter of law to sustain the allegation brought. *Nash v. Schultz*, 417 N.W.2d 241, 243 (Iowa App.1987). A directed verdict is appropriate in cases where each element of the claim is not supported by substantial evidence. *Oberreuter v. Orion Industries, Inc.*, 398 N.W.2d 206, 209 (Iowa App.1986). A mere scintilla of evidence is not sufficient to require denial of a motion for directed verdict. *Id.* The trial court is vested with considerable discretion in determining whether evidence is sufficient. *Id.*

In order to prove fraud, it is necessary to establish each of the following by a preponderance of clear, satisfactory, and convincing evidence: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage. *Grefe v. Ross*, 231 N.W.2d 863, 864 (Iowa 1975). A review of the record reveals that the district court judge concluded that plaintiff's evidence failed to support a finding of fraud and specifically that the element of intent to deceive was not sufficiently supported in this case. Plaintiff argues, among other things, that defendant's actions in hatching its own chicks without disclosing these plans to plaintiff, and in accepting far fewer chicks than originally estimated is evidence of defendant's fraudulent intent. Other evidence presented at trial, however, indicates defendant may have set some of its own eggs because plaintiff refused to guarantee defendant a priority in receiving chicks from plaintiff. Defendant's correspondence to plaintiff revealed that defendant would be setting some of its own eggs during the 1985 hatching season. Furthermore, the record reveals that economic and weather conditions depressed the entire industry and that was a contributing factor to defendant's decreased purchases.

A review of the record in this case reveals that the evidence presented by plaintiff was insufficient to establish the element of intent necessary to a fraud action. The trial court did not err in directing a verdict on plaintiff's action for fraud.

## III. *Requirements Contract*

■ The trial court found that the parties had entered into a requirements contract pursuant to Iowa Code section 554.-2306(1). Defendant challenges this finding and asserts that in a requirements contract a purchaser must bind itself to purchase *all* of its requirements for particular goods or services from a particular seller. Since plaintiff knew that defendant would be acquiring chicks from sources other than plaintiff (i.e., defendant was going to hatch

some of its own chicks), defendant contends that the trial court erred in concluding that a requirements contract was established in this case.

There are no Iowa cases which address the question of whether a buyer must promise to purchase exclusively from a seller to create a requirements contract. Examination of the statutory language reveals that this section provides that a contract for requirements is not too indefinite to be enforced. A term which measures quantity by the requirements of the buyer may be used in lieu of a specification of a certain quantity. The statute impresses a "good-faith" limitation upon the elasticity inherent in such a contract. Furthermore, the statute recognizes that such contracts may include stated estimates as to a buyer's requirements.

Section 554.2306(2) addresses the good faith obligations that inhere in exclusive dealing contracts. Nothing in the statutory language of section 554.2306, or in the official comments to that section, suggests that exclusivity is a prerequisite to the establishment of a requirements contract. Section 554.2306 addresses two separate and independent concerns. Section 554.-2306(1) legitimizes the existence of requirement contracts, while subparagraph (2) codifies the commercial rule of good faith in exclusive dealing agreements. The official comment to section 554.2306 appears to recognize this distinction. Comment (5) specifies that an exclusive dealing agreement brings into play all of the good faith aspects of the output and requirement provisions of subsection (1). No similar comment suggests that the exclusivity aspects of section 554.2306(2) are incorporated into subsection (1).

Even if exclusivity were to be regarded as an element of a requirements contract, this requirement can be satisfied if the buyer contracts to purchase up to a specified amount exclusively from the seller. Axelrod, *The Requirements Contract— What is Required*, 31 Drake L. Rev. 83, 90 (1981–82). "The requirement of exclusivity does not mean that the buyer must contract to purchase all of his requirements from a particular seller." *Id. See e.g. City of Louisville v. Rockwell Manufacturing Co.*, 482 F.2d 159, 164 (6th Cir.1973) (Provision in agreement for furnishing part of purchaser's requirements would not render agreement to be without mutuality).

Defendant argues that if exclusivity is not a prerequisite to a requirements contract, then there is no longer an objective measure by which its good faith compliance with the contract can be measured. However, this court finds that the inclusion of defendant's expected requirements set forth in the correspondence which constitutes the agreement, is a sufficient standard by which the good faith of the parties may be measured.

This court rejects defendant's arguments that as a matter of law the agreement in this case could not have constituted a requirements contract between the parties. The findings of fact in a law action are binding upon the appellate court if supported by substantial evidence. Iowa R.App.P. 14(f)(1). There is sufficient evidence in the record to support the district court's determination that the parties had entered into a requirements contract.

## IV. *Mitigation of Damages*

Plaintiff asserts that the trial court erred in finding that it had failed to mitigate the damages it sustained and in applying a comparative fault analysis when determining the damages. A review of the trial court's decision reveals that the trial judge found appellant's losses to be $70,-529. For failing to mitigate, the trial court concluded that appellant's damages had to be reduced by 70%. Nothing in the trial court's decision indicates that the judge was applying Chapter 668 (the Comparative Fault Act), nor that he was determining "fault." In fact, the decision of the trial judge reflects that he relied on U.C.C. provisions to determine damages in the case. While the trial court judge's characterization of the damages in terms of percentages is not as clear as it might be, the overall decision of the judge reveals that he

did not inappropriately apply a comparative fault analysis to this case.

There is substantial evidence in the record to support the trial court's conclusion that plaintiff was aware of defendant's intention to accept fewer chicks than originally estimated, and yet plaintiff failed to mitigate its losses in response to these breaches. The trial court's determination of damages is affirmed.

AFFIRMED.