SOURCECORP BPS, INC., Plaintiff,

v.

KENWOOD RECORDS
MANAGEMENT, INC.,
Defendant.

No. 4:06–cv–00435–JEG.

United States District Court,
S.D. Iowa,
Central Division.

April 30, 2008.

---

Beverly Ann Whitley, Karen L. Hart, Matthew R. Scott, Bell Nunnally & Martin LLP, Dallas, TX, J. Campbell Helton, Whitfield & Eddy, PLC, Des Moines, IA, for Plaintiff.

Vernon Pellett Squires, Bradley & Riley, Cedar Rapids, IA, for Defendant.

### ORDER

JAMES E. GRITZNER, District Judge.

Before the Court are the parties' cross motions for summary judgment. The Court conducted a motion hearing on February 27, 2008. Present at the hearing were Beverly Whitley and J. Campbell Helton for Plaintiff Sourcecorp BPS, Inc. (Sourcecorp), and Vernon Squires for Defendant Kenwood Records Management, Inc. (Kenwood). The matter is fully submitted and ready for disposition.

## I. BACKGROUND

On February 1, 2002, Kenwood contracted with Digital Data Resources (DDR) to provide document imaging services for Kenwood's client, GMAC Mortgage Corporation (GMAC). The parties entered into a Master Agreement for Services (Master Agreement), which specified, "Kenwood desires to contract with DDR for the services more fully described in Annex A and any subsequent Annexes or Statement of Work." Annex A, also dated February 1, 2002, stated in relevant part as follows:

> This Service Order ("Service Order") is issued pursuant to the Master Agreement (the "Agreement") between Digital Data Resources, Inc. (DDR) and Kenwood Records Management, Inc. ("Client") dated February 1, 2002, and the terms and conditions of such Agreement shall be applicable to the services and deliverables provided under this Service Order.
>
> 1. Conversion Services. (a) Overview. In consideration for compensation described in Section 2, DDR agrees to provide services to Client to convert paper page sides ("Source Media") provided to Client by Client's customer, GMAC Mortgage Corporation ("End User") to images on CD–ROM in accordance with this Service Order (the "Conversion Services").
>
> **(b) Projected Volumes. End User's projected acquisition loan volumes for 2002 are indicated in the table below. Actual acquisition volumes may vary and these projections should only be used as an estimate but in no instance shall Client outsource documents referred to in this agreement to another service bureau as long as DDR is meeting the terms of this agreement, without express written consent of DDR. It is the purpose of this document to establish an exclusive imaging and related services arrangement with DDR.**
>
> Notwithstanding the foregoing, or anything to the contrary herein, End User

does not guarantee that DDR will be asked to perform any minimum or maximum amount of Services hereunder.

| Month | Loan Count |
| --- | --- |
| January | 7,143 |
| February | 7,143 |
| March | 33,534 |
| April | 9,643 |
| May | 35,965 |
| June | 10,643 |
| July | 39,143 |
| August | 13,143 |
| September | 13,143 |
| October | 13,143 |
| November | 13,143 |
| December | 208,927 |

(emphasis added). DDR President Mark Havlicek had primary responsibility in drafting the Master Agreement and Annex A.

The terms of the Master Agreement covered the time period from February 1, 2002, through January 31, 2007. Annex A was the only annex or statement of work the parties ever executed. In 2002, after Kenwood and DDR entered the Master Agreement, Sourcecorp acquired DDR and thus succeeded to DDR's rights and obligations under the Master Agreement.

During the relevant period, Sourcecorp's executive team included Mike Wickman (Wickman), senior vice president for Sourcecorp's north central region; Brian Verhagen (Verhagen), vice president of sales for Sourcecorp's north central region; Adam Henderson (Henderson), director of operations for Sourcecorp's north central region; and Ruthie Wagner (Wagner), plant manager for Sourcecorp's Cedar Rapids operations. Wickman was vice president and highest ranking regional executive of Sourcecorp's North Central Region, which was headquartered in Green Bay, Wisconsin. Wagner was Sourcecorp's highest ranking representative at the Cedar Rapids operation.[1]

In 2002, Sourcecorp acquired three refurbished scanners for its Cedar Rapids operation. Beginning in 2003, Kenwood complained to Sourcecorp about the lack of IT support and the need for more scanners to keep up with the GMAC imaging needs. Kenwood employee Matt Usher[2] repeatedly communicated Kenwood's frustrations.

On September 4, 2003, in an attempt to encourage better performance by Sourcecorp on the Kenwood–GMAC account, Usher identified a "pot of gold" opportunity for Sourcecorp to bid on GMAC imaging work in Horsham, Pennsylvania. On September 9, 2003, Usher received an email from GMAC complaining the turnaround time for imaging services had deteriorated. Usher forwarded the email to Brian Verhagen at Sourcecorp and told Verhagen, "[t]his is what I fear from a lack of IT resources." Verhagen in turn asked Sourcecorp's IT director to address the problem, indicating "the timing is bad, but I believe we have no choice."

In January 2005, Usher advised Vern Maples, Sourcecorp's IT director, that the GMAC monthly scanning volumes had increased from 420,000 images to 710,000 images during the final quarter of 2004 and asked whether Sourcecorp had located more scanners. Maples responded that Sourcecorp had not found any available scanners to add to Cedar Rapids.

---

1. Wickman resigned in August 2006, and Verhagen resigned in June 2006.

2. Prior to going to work for Kenwood, Usher worked for DDR and Sourcecorp.

In early March 2005, Sourcecorp missed a scheduled conference call involving Kenwood and GMAC. Verhagen sent an email to Usher acknowledging the error and stated, "My apologies. Sounds like we dropped the ball on this."

Also in March 2005, in response to a request by GMAC, Kenwood asked Sourcecorp about providing digital images on a File Transfer Protocol (FTP) website. (At the time, Sourcecorp was providing the GMAC digital images in CD–ROM format.) Sourcecorp quoted Kenwood a price of $10,000 to develop the FTP. Kenwood acknowledged the FTP was "outside of the original scope of work" but rejected the quoted price as too high. Through April 2005, the parties negotiated Sourcecorp's development of the FTP without success.

On April 28, 2005, Usher sent an email to Verhagen acknowledging that Sourcecorp and Kenwood had apparently reached an impasse regarding the development of the FTP. Usher expressed Kenwood's dissatisfaction with Sourcecorp's inattention to Kenwood's imaging requirements and remarked that aside from its initial hardware and software investment in 2002, Sourcecorp had not invested in the Kenwood account and appeared to view its Cedar Rapids operation with indifference. Usher informed Sourcecorp that "Kenwood simply [could] not afford to put at risk its relationship with GMAC, and therefore need[ed] to assume full responsibility for image/index delivery."

On March 7, 2005, and again on May 16, 2005, GMAC finance director Mark Galambos (Galambos) met with Usher in Cedar Rapids to discuss GMAC's projected volume increases. After the May 16 meeting, Galambos sent an email to Usher reiterating GMAC's capacity concerns and seeking Kenwood's assurance scanners would be acquired to meet GMAC's needs.

On May 18, 2005, Usher forwarded Galambos' email to Verhagen and informed Verhagen that Kenwood was at risk of losing the GMAC account due an inability to process GMAC's existing loan volumes and an apparent lack of capacity to handle projected volume increases. Usher informed Verhagen it was imperative for Sourcecorp to "make adjustments in staffing and equipment to provide excess capacity in the short-term to accommodate the projected increases with appropriate turnaround" time frames. Usher agreed Sourcecorp's proposed strategy to shift work to Sourcecorp's other facilities might ease capacity constraints at the Cedar Rapids facility in the short run. However, due to projected increasing volumes, shorter turnaround times, and the tendency for scanners to break down, Usher expressed doubt that Sourcecorp's proposal to increase the number of shifts at the Cedar Rapids facility without adding scanners would resolve the long-term capacity problems. Usher told Verhagen that Wagner, the Cedar Rapids facility manager, repeatedly intimated if Sourcecorp added a third shift without adding more scanners, it would result in overused equipment and frequent equipment breakdowns. Usher reminded Verhagen adjustments in staffing and equipment were "imperative" and asked Verhagen to respond "ASAP" with Sourcecorp's plan.

On May 23, 2005, responding on behalf of Verhagen, Henderson sent Usher an email detailing Sourcecorp's proposed plan to (1) keep two shifts at the Cedar Rapids location and move other accounts to Sourcecorp's Green Bay facility, which would increase by 18 percent the hours available at the Cedar Rapids facility for working on GMAC documents; (2) rebuild the three scanners at the Cedar Rapids location over a twenty-four week period, which would reduce the scanner down time from the current rate of 2 percent; and (3) poten-

tially add a third shift, which would increase by 111 percent the scan hours available for working on the GMAC account.

On May 24, 2005, Verhagen sent an email to Usher disclaiming knowledge of GMAC's projected volume increases, any commitments to add equipment, and the quicker turnaround time. Verhagen stated Sourcecorp would "continue 'as is' to see how the added volume off-sets projected higher costs." Thereafter, Sourcecorp calculated how many images Sourcecorp could scan by operating its equipment up to twenty-four hours per day, five days per week. Sourcecorp concluded the existing equipment could handle GMAC's volumes and projected volumes (34,417 loans/files per month using two shifts per day and 56,297 loans/files per month using three shifts per day). Sourcecorp never moved accounts to its other facilities or rebuilt the existing scanners at the Cedar Rapids facility.

In November 2005, convinced it would lose the GMAC account as a result of these production issues, Kenwood invested more than $200,000 in equipment and began scanning GMAC loan documents in house. Although Kenwood continued to provide Sourcecorp with GMAC work until the Master Agreement terminated in January 2007, Kenwood's accounts payable records show payments to Sourcecorp dropped from $683,835.43 in 2005 to $267,690.73 in 2006,[3] while GMAC's loan document imaging demands increased from 415,318 documents to 550,895 documents during the same time period. Sourcecorp closed its Cedar Rapids operation in February 2007.[4]

On September 11, 2006, Sourcecorp filed this action, alleging Kenwood breached the Master Agreement. Kenwood denied Sourcecorp's allegations and filed counterclaims for the award of attorney fees. Both parties filed motions for summary judgment.

## II. DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is proper when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact for trial, and the moving party is entitled to judgment as a matter of law." *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 907 (8th Cir.2006) (citing Fed.R.Civ.P. 56(c)); *see, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to defeat a motion for summary judgment, the nonmoving party must do more than rest on its pleadings; it must demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1110 (8th Cir.2007).

### B. Breach of Contract Under Iowa Law

The parties agree Iowa law governs this diversity action. Sourcecorp argues the Master Agreement is unambiguous, and

---

3. Kenwood's accounts payable for imaging services performed in 2002–2006 show payments to Sourcecorp of $344,526.65, $428,165.77, $254,868.51, $683,835.43, and $267,690.73, respectively.

4. As early as 2004, Sourcecorp began exploring the feasibility of closing its Cedar Rapids operation and moving all Cedar Rapids' scanning to its Green Bay facility. At the time, however, Sourcecorp was submitting bids for the GMAC–Horsham imaging contract. Sourcecorp did not win the Horsham bid and closed its Cedar Rapids operation in February 2007.

Kenwood breached that agreement by performing GMAC loan document imaging in house. Kenwood resists, asserting there are genuine issues of material fact regarding whether Kenwood entered into a requirement contract with DDR in 2002 and thus bound Kenwood for a stated period of time to purchase all its particular imaging requirements from Sourcecorp in exchange for Sourcecorp agreeing to furnish Kenwood's requirements during that period. In its own motion for summary judgment, Kenwood argues it is entitled to summary judgment because there is no genuine dispute of fact regarding Kenwood's compliance with the parties' agreement.

 Under Iowa law, "a breach of contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract." *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 27 (Iowa 1997).

> In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

 The determination of the legal effect of a contract is a question of law for the court to decide. *Id.* at 225. "A cardinal rule of contract construction or interpretation is the intent of the parties must control." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). To determine the parties' intent, the court looks at the time frame when the contract was executed. *Id.* Contract interpretation in-

volves a two-step process. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). "First, from the words chosen, a court must determine 'what meanings are reasonably possible.' In so doing, the court determines whether a disputed term is ambiguous." *Id.* (internal citation omitted) (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). If the contract's words are clear and unambiguous, the "contract will be strictly construed." *SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 586 (Iowa 2002). "A term is not ambiguous merely because the parties disagree about its meaning." *Walsh*, 622 N.W.2d at 503. "[A]n ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Hartig Drug Co.*, 602 N.W.2d at 797. An ambiguity should be strictly construed against the drafter. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862–63 (Iowa 1991). If an "ambiguity is identified, the court must then 'choos[e] among possible meanings.'" *Walsh*, 622 N.W.2d at 503 (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). "In ascertaining the meaning of contractual terms extrinsic evidence is admissible as an aid to interpretation when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain." *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997) (internal quotation omitted). "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Iowa Fuel*, 471 N.W.2d at 863.

At issue in this case is whether the exclusivity provision contained in Annex A created a requirements contract that pre-

cluded Kenwood from performing some of the GMAC imaging in house while the Master Agreement was in effect. Kenwood argues the Master Agreement only created an exclusive subcontracting relationship not a requirements contract, and therefore Kenwood did not breach the Master Agreement because it never subcontracted GMAC imaging to other vendors.

■ The exclusivity clause in the Master Agreement states, "Actual acquisition volumes may vary and these projections should only be used as an estimate but in no instance shall Client outsource documents referred to in this agreement to another service bureau as long as DDR is meeting the terms of this agreement, without express written consent of DDR." Sourcecorp argues this exclusivity clause required Kenwood to send all its GMAC imaging to Sourcecorp, and thus Sourcecorp breached the Master Agreement by performing imaging work in house. Sourcecorp reads the exclusivity clause contained in Annex A too broadly.

First, the Master Agreement only restricts Kenwood from "outsourcing" imaging to "another service bureau." The Master Agreement does not define outsourcing, therefore the Court applies the term's plain meaning. To outsource means "to send out (e.g., work) to an *outside* provider or manufacturer in order to cut costs." Webster's II New College Dictionary 798 (3d ed. 2005) (emphasis added). Other references similarly define the term. *See* Dictionary.com. Dictionary.com Unabridged (v 1.1). Random House, Inc. http://dictionary.reference.com/browse/outsourcing (accessed: April 23, 2008) ("[T]o obtain goods or services from an *outside* supplier or source." (emphasis added)); Investopedia.com. Investopedia Inc. http://www.investopedia.com/terms/o/outsourcing.asp (accessed: April 23, 2008)

("A practice used by different companies to reduce costs by transferring portions of work to outside suppliers *rather than completing it internally*." (emphasis added)). *Cf. Sandoval v. Apfel*, 86 F.Supp.2d 601, 603 n. 2 (N.D.Tex.2000) ("Outsourcing is defined as [t]he assignment of tasks to *independent* contractors, such as individual consultants or service bureaus." (quotation omitted) (alteration in original) (emphasis added)).

Annex A unambiguously identifies Sourcecorp as an outside imaging service bureau and Kenwood as Sourcecorp's client. Applying the definition of "outsourcing" in light of both the Master Agreement and Annex A, the exclusivity clause precludes Kenwood from assigning any GMAC imaging services to any *other* outside imaging service bureau. Because Kenwood is neither *outside* nor a *service bureau*, Kenwood did not bargain away and was not contractually precluded from performing GMAC imaging services in house.

Second, neither the Master Agreement nor Annex A uses the term "requirements contract." Nonetheless, relying on *Hoover's Hatchery, Inc. v. Utgaard*, 447 N.W.2d 684 (Iowa Ct.App.1989), Sourcecorp asserts that a requirements contract is created when the agreement specifies the supplying party will provide a designated amount of goods or services; and a breach occurs when, as here, the receiving party obtains some of those goods or services from another source, even if the other source is the receiving party's own in-house production unit. *Hoover's Hatchery* is distinguishable from the present case.

In *Hoover's Hatchery*, defendant Utgaard's Hatchery (Utgaard's) initiated negotiations in the spring of 1984 to buy Hoover's Hatchery (Hoover's) but those negotiations were suspended when Hoover's refused make its financial statements available to Utgaard's. *Id.* at 684–85.

Thereafter, in the summer of 1984, Utgaard's and Hoover's negotiated an agreement, whereby Hoover's would provide substantially all Utgaard's chick requirements for 1985. Although the parties never set a definitive number, Utgaard's estimated it would purchase over 400,000 chicks from Hoover's in 1985. After Hoover's increased its egg orders and obtained space in another hatchery in anticipation of fulfilling Utgaard's order, Utgaard's repeatedly reduced its chick estimate. When the 1985 hatching season arrived, Utgaard's ordered far fewer chicks from Hoover's than any of the estimates provided. In addition, contrary to Hoover's understanding of the parties' agreement, Utgaard's produced a substantial number of chicks in its own hatchery during the 1985 hatching season. Hoover's suffered substantial losses as a result of Utgaard's drastically reduced chick order. After the 1985 season, Utgaard's renewed inquiries about purchasing Hoover's Hatchery.

Hoover's sued Utgaard's, alleging fraud, misrepresentation, breach of contract, and estoppel. *Id.* at 685. The state district court found Utgaard's in breach of a requirements contract under Iowa Code § 554.2306. On appeal, the Iowa Court of Appeals affirmed, concluding an exclusivity provision was not a prerequisite to the establishment of a requirements contract, and "a contract for requirements is not too indefinite to be enforced" where a "term which measures quantity by the requirements of the buyer may be used in lieu of a specification of certain quantity." *Id.* at 688.

Although this Court agrees that the formation of a requirements contract is not necessarily defeated simply because the phrase "requirements contract" is not contained in an agreement, such a distinction is irrelevant in the present case. Contrary to Sourcecorp's read of *Hoover's Hatchery,* that court did not find Utgaard's in breach of a requirements contract *because* it hatched chicks in its own hatchery; rather, the court reasoned neither the fact that the parties anticipated Utgaard's would hatch some of its own chicks nor the lack of an exclusivity provision defeated the formation of a requirements contract. *Id.* at 688. Utgaard's in-house chick production was incidental to Utgaard's failure to abide by the terms of the parties' agreement. The Court finds *Hoover's Hatchery* provides no aid in the Plaintiff's effort to avoid the express terms of the contract under the circumstances in this record.

In the present case, the projected volumes contained in Annex A only pertained to 2002. Annex A clearly anticipated these projected volumes would vary, stating, "[GMAC]'s projected acquisition loan volumes for 2002 are indicated in the table below. Actual acquisition volumes may vary and these projections should only be used as an estimate ..." Sourcecorp does not complain Kenwood failed to fulfill the projected volumes for 2002, and it is undisputed the parties never entered into any other annex or service order. Therefore, after 2002, in the absence of any quantity estimate, the only volume requirement was the restriction precluding Kenwood from hiring an outside service bureau to perform GMAC document imaging.[5] Source-

5. The parties dispute whether Annex A remained in effect after 2002. Because the Court finds the exclusivity provision contained in Annex A did not preclude Kenwood from in-house imaging of GMAC documents, it is immaterial whether Annex A expired after 2002. The Court notes, however, Sour- cecorp's argument that the volume estimate in Annex A is evidence Sourcecorp and Kenwood had an exclusive output requirements agreement through 2007 is inherently inconsistent with Sourcecorp's argument that it is inconsequential there are no volume estima-

corp does not allege Kenwood subcontracted its GMAC imaging needs to another service bureau.

The Court finds neither the terms of the Master Agreement nor Annex A prevented Kenwood from imaging GMAC documents in house, and therefore Kenwood did not breach the terms of the Master Agreement. Kenwood is therefore entitled to summary judgment on Sourcecorp's breach of contract claim.

## III. CONCLUSION

The Court concludes the actions taken by Kenwood were not precluded by the express terms of the contract. In the absence of any breach, Sourcecorp's Motion for Summary Judgment (Clerk's No. 18) is **denied,** and Kenwood's Motion for Summary Judgment (Clerk's No. 25) is **granted.** Pursuant to the provisions in Paragraph 9.9 of the Master Agreement, the Court grants Kenwood's request to submit an application for attorney fees and costs.

The final pretrial conference scheduled for July 1, 2008, and the trial scheduled to commence July 14, 2008, are canceled.

**IT IS SO ORDERED.**

tions for 2003 through 2007 because Annex A's volume estimation only pertained to 2002.