**CMI CORPORATION, Plaintiff,**

v.

**The COSTELLO CONSTRUCTION CORPORATION, Defendant.**

**No. CIV–77–0317–T.**

United States District Court,
W. D. Oklahoma.

Oct. 27, 1977.

Jerry J. Dunlap, Dunlap, Codding & McCarthy, Oklahoma City, Okl., for plaintiff.

LeRoy Powers, Oklahoma City, Okl., for defendant.

## ORDER

RALPH G. THOMPSON, District Judge.

The plaintiff, an Oklahoma corporation with its principal place of business in Okla-

homa, has brought this action against the defendant corporation, a Connecticut corporation having its principal place of business in Connecticut, for the recovery of money allegedly due pursuant to an oral rental agreement. The defendant has filed a Motion to Dismiss for lack of jurisdiction over the person and for improper venue pursuant to Rule 12(b)(2) and 12(b)(3), respectively, of the Federal Rules of Civil Procedure.

Subject matter jurisdiction in this case being founded upon diversity of citizenship, the Court must look to Oklahoma law for the basis of personal jurisdiction over a non-resident defendant. Oklahoma's "long-arm" statutes[1] were intended to expand the proper exercise of *in personam* jurisdiction by Oklahoma courts over non-residents to the outer limits permitted by the due process requirements of the United States Constitution.[2]

The United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), provided guidance for establishing where, in a particular case, the "outer limits" of due process fall. The Court, speaking through Chief Justice Stone, said at 316, 66 S.Ct. at 158:

"... [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

In an attempt to make "minimum contacts" a manageable standard the Court explained at 319, 66 S.Ct. at 159:

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.

But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." [Citations omitted]

The facts, out of which this controversy arises and from which the contacts with Oklahoma which would form the basis for *in personam* jurisdiction over the defendant, are found in the complaint and in an affidavit of Frank Costello, vice president of the defendant corporation. The complaint states that the plaintiff, CMI Corporation ("CMI"), is in the business of manufacturing, selling and leasing highway construction machinery and the defendant, Costello Construction Corporation ("Costello"), is in the business of building and resurfacing highways and streets. In the course of its business, Costello utilizes highway construction machinery. In early 1976 CMI developed an automated highway construc-

---

1. 12 O.S.1976 Supp., § 187 and 12 O.S.1971, § 1701.03.

2. *George v. Strick Corporation*, 496 F.2d 10 (10th Cir. 1974); *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48 (Okl.1976); *Carmack v. Chemical Bank New York Trust Co.*, 536 P.2d 897 (Okl.1975); *Vemco Plating, Inc. v. Denver Fire Clay Company*, 496 P.2d 117 (Okl. 1972); *Hines v. Clendenning*, 465 P.2d 460 (Okl.1970).

tion machine capable of removing a quantity of material, such as asphalt or concrete, from the surface of an existing road. The complaint states at paragraph 7 that Costello is not domesticated in Oklahoma but has been and is doing business in this state. However, the complaint fails to set forth the factual background for this conclusion. At paragraph 9 of the complaint the plaintiff asserts that in the spring of 1976, CMI and Costello entered into an oral agreement in Oklahoma City whereby CMI agreed to provide its automated machine to Costello for use in a street repair operation Costello was about to bid on in Rochester, New York. Paragraph 14 of the complaint states that, pursuant to the oral agreement, CMI shipped its machine from Oklahoma City, Oklahoma, to Costello on or about July 21, 1976.

Mr. Costello's affidavit sets forth that in June of 1976, Costello was preparing to bid on a contract to be let by the City of Rochester, New York for street repairs. It involved the removal of a substantial amount of old asphalt. Costello had heard of the pavement removal machine recently developed by CMI and on June 24, 1976, made a trip to Oklahoma City for the purpose of obtaining information as to its availability, rental cost and performance capability. Mr. Costello states that on this trip to Oklahoma City he met with Mr. George Swisher, president of CMI, and discussed the possibility of renting the machine. He furnished Mr. Swisher a set of the specifications for the Rochester job and Mr. Swisher quoted proposed rental rates for the machine for one inch and two inch removal, assuring Costello that the machine, in a single operation would have no trouble in removing the pavement to the depths indicated in the specifications. Mr. Costello advised Mr. Swisher that the prices looked good if the machine could perform in the manner represented and that he would take these prices into consideration in preparation of his bid to the City of Rochester. Mr. Costello states that no contract, either oral or written, was entered into between them on this occasion and he returned to Connecticut. He telephoned Mr. Swisher a few days later requesting additional information concerning the maintenance of the machine, then submitted his bid on about July 2, 1976. He was determined to be the low bidder for the Rochester contract. He promptly notified Mr. Swisher by phone that the defendant corporation had been awarded the contract and stated that he desired to make arrangements to rent the machine. Mr. Costello states that on this occasion Mr. Swisher stated that he would like to inspect the job site before finally making an agreement and stated that he would come to Rochester for this purpose and consummate the transaction. Mr. Swisher and two other representatives of CMI went to Rochester, New York, met with officials of Costello and conducted a thorough inspection of the streets where pavement removal work was to be performed. During the inspection Mr. Swisher, on numerous occasions, tested the hardness of the pavement with his pocket knife and examined the broken pieces of pavement. After the inspection, the parties orally confirmed the rental rates for the machine and tentatively agreed that the machine would be shipped to Rochester as soon as two other small jobs, one in Waterloo, Iowa, and one at Chicago O'Hare Airport, had been completed. Costello agreed to this schedule and the machine arrived at Rochester around August 2, 1976. Approximately a month after the job had commenced, CMI submitted a proposed written contract which contained provisions not previously discussed and which were unacceptable to Costello. The written contract was never executed.

Pursuant to the agreement of the parties, CMI furnished two men to train Costello's personnel in the operation of the machine. Almost immediately after commencing work, it was found that the machine would not remove pavement to the depths specified by the specifications in one operation. It was also discovered that the machine would not remove material close to the curbs. Mr. Costello states that constant difficulty was encountered with numerous mechanical problems and breakdowns.

Mr. Swisher and other CMI personnel went to the job site to observe the problems and to make attempts at correcting them in order to obtain better production from the machine. Subsequently, with the agreement of Mr. Swisher, Costello employed one Lloyd McCarthy, an experienced construction superintendent, in an effort to obtain results from the machine. According to the affidavit of Mr. Costello, these efforts were without success. Mr. Costello states that it is out of the failure of the machine to perform as represented that the controversy between the parties arose and it has not yet been resolved.

Mr. Costello states that in November, 1976, after the completion of the Rochester job, he held a demonstration of the CMI machine for the State Highway officials of the State of Connecticut. The Connecticut officials were interested in having a small amount of pavement removed to a depth of approximately three-fourths of an inch. A removal to this depth was well within the capacity of the machine. CMI agreed that Costello should perform this work for the State of Connecticut. Prior to the performance of this work, the machine was demonstrated to the Connecticut Highway officials. On this occasion, Mr. Swisher went to Connecticut and further discussion between him and Mr. Costello was had with respect to the Rochester job. Following this, Mr. Costello made an additional trip to Oklahoma City and further discussed the Rochester job but the controversy remained unresolved.

Mr. Costello states that the defense of this action will require the production of a substantial number of witnesses, documentary evidence and records all of which are located in the Western District of New York and in the State of Connecticut. He concludes that under such circumstances it would be inconvenient, expensive and burdensome to defend this action in Oklahoma.

 In addressing the jurisdictional question, the plaintiff apparently confuses subject matter jurisdiction with personal jurisdiction stating:

"Jurisdiction is based upon diversity of citizenship in that Plaintiff is an Oklahoma corporation and Defendant is a Connecticutt [sic] corporation. Further, the amount in controversy exceeds the sum of Ten Thousand Dollars exclusive of costs and interest. Such facts being admitted by the Defendant, there is absolutely no question that this Court has jurisdiction over the parties to this suit. 28 U.S.C. § 1332." [3]

The diversity of citizenship provisions under § 1332 only confer subject matter jurisdiction. Personal jurisdiction must be established through contact with the forum which, within the bounds of due process, allows the Court to act with respect to the person of the defendant. However, the plaintiff correctly states that the test of "doing business" under the federal venue statutes governing defendant corporations is co-extensive with the question of whether a non-resident defendant is doing business within the forum state for the purpose of determining whether service under a state statute comports with due process. The plaintiff relies on *Houston Fearless Corp. v. Teter*, 318 F.2d 822 (10th Cir. 1963). The plaintiff lists eleven contacts which under its approach would both make the defendant amenable to service of process, therefore establishing *in personam* jurisdiction, and establish venue in this district.

"(1) Plaintiff is a manufacturer of highway construction equipment with its principal manufacturing facility within this District.

(2) The machine, which is the underlying subject of this suit, was manufactured within this District.

(3) Defendant came to Oklahoma City in early 1976 for the express purpose of soliciting information about leasing the machine from Plaintiff, and for the purposes of such solicitation, Defendant brought a set of specification of a contract with which it desired to utilize the Plaintiff's machine.

**3.** Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss, page 2.

(4) Discussion and negotation [sic] regarding rental rates of Plaintiff's machine were had between Plaintiff and Defendant in Oklahoma City.

(5) Defendant telephoned Plaintiff in Oklahoma City to notify Plaintiff that Defendant had been awarded the construction contract referred to above.

(6) Plaintiff's president went to Rochester and, after inspecting the job, confirmed the rental rates previously discussed in Oklahoma City.

(7) Pursuant to the agreement, Plaintiff in Oklahoma City caused the machine to be delivered to Defendant in Rochester, New York.

(8) Defendant sent one payment for rental to Oklahoma City.

(9) Defendant again came to Oklahoma City in December of 1976 in an attempt to resolve the contractual dispute between Plaintiff and Defendant.

(10) An employee of Defendant inquired of Plaintiff in Oklahoma City if Defendant might perform additional services for Plaintiff using the machine to demonstrate its capabilities for the State of Connecticutt [sic].

(11) Numerous spare parts were manufactured in Oklahoma City for Defendant at Defendant's request for use on the machine by Defendant." [4]

Although the Court agrees that the "doing business" test under 28 U.S.C. § 1391(c), with respect to venue, and the "transaction of any business" test under 12 O.S.1976 Supp., § 187(a)(1) and 12 O.S.1971, § 1701.-03(a)(1) [5], with respect to personal jurisdiction, are closely analogous, they will be treated separately. The jurisdictional question will be examined first as the Court finds it to be dispositive.

*International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) greatly expanded the perimeter of proper exercise of *in personam* jurisdiction over non-resident defendants. The U.S. Supreme Court, in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), provided additional guidance in this area while injecting a cautionary note at 250–251, 78 S.Ct. at 1238:

> "As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565, to the flexible standard of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. *See Vanderbilt v. Vanderbilt*, 354 U.S. 416, 418, 77 S.Ct. 1362, 1 L.Ed.2d 1456. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts" with that State that are a prerequisite to its exercise of power over him." [6]

While every case must be decided on its own facts, it is generally understood that a non-resident corporation's activities within a state must be "substantial", "continuous", and "regular" as distinguished from "casual", "single", or "isolated" acts in or-

---

4. Id., pages 2–3.

5. Although the wording of § 1701.03(a)(1) is slightly different, the import is identical.

6. The ruling of *Hanson v. Denckla* was succinctly summarized by Judge Jones of the Fifth Circuit in *Dooly v. Payne*, 326 F.2d 941 (5th Cir. 1964) where he commented that *Hanson* "teaches that, although the door of non-resident jurisdiction has been opened wider by *International Shoe* and *McGee*, it has not been removed from its hinges, . . . .".

der to constitute "engaging in or transacting business" within a state so as to be found there for the purposes of personal service.[7]

It is clear that the mere employment of a resident by a non-resident, even where the resident performs work for the non-resident in Oklahoma, does not establish sufficient contact on the part of the non-resident with Oklahoma to subject the non-resident to the jurisdiction of Oklahoma courts.[8] This is true where the employee chooses to perform the work in Oklahoma and where the employment does not entail the employee acting as an agent of the employer for the purpose of carrying on the business of the employer in Oklahoma.

An out-of-state seller is easily made subject to the actions brought on behalf of resident purchasers or users.[9] Generally, the courts have been reluctant to assert jurisdiction over a non-resident buyer.[10] The reason most often given for this buyer-seller distinction is that the seller is usually the aggressor or initiator in the forum and by selling his product in the state he receives not only a profit but the benefit and protection of the forum state's laws.[11] The Court in *Geneva Industries, Inc. v. Copeland Construction Corp.*, 312 F.Supp. 186 (N.D.Ill.1970), made the following comment at page 188:

"The notion that any customer of an Illinois based mail order house such as Sears Roebuck or Montgomery Ward would be subject to the jurisdiction of Illinois courts is obviously violative of the most minimal standard of minimum contacts and the fundamental structure of the federal system."

To subject such out-of-state buyers to local court jurisdiction would not only obliterate state boundaries but would discourage out-of-state purchasers from dealing with resident sellers. However, an additional distinction has developed in the case law. This distinction involves "active-purchaser, passive-purchaser" classification. The "passive-purchaser" has been defined as one "who simply places an order and sits by until the goods are delivered".[12] The "active-purchaser" classification was adopted, as establishing sufficient contact for the extra-territorial exercise of jurisdiction over such buyer, by the Oklahoma Court of Appeals, Division 2, in *Vacu-Maid, Inc. v. Covington*, 530 P.2d 137 (Okl.App.1974), and by the Oklahoma Supreme Court in *Yankee Metal Products Company v. District Court*, 528 P.2d 311 (Okl.1974). In the *Yankee Metal Products* case, agents of Yankee Metal[13] called agents of Del City Wire Company (Del Wire) in Oklahoma to discuss the purchase of wire harnesses after seeing some direct mail advertisements of Del Wire. A large number of harnesses were ordered to be custom-built according to samples supplied by Del Wire by Yankee Metal. Upon their arrival in Connecticut, the harnesses were rejected by Yankee Metal as not meeting the requested specifications. Del Wire sued to collect in Oklaho-

7. *Houston Fearless Corporation v. Teter*, 318 F.2d 822 (10th Cir. 1963) at 826, and *Steinway v. Majestic Amusement Co.*, 179 F.2d 681, 18 A.L.R.2d 179, cert. denied, 339 U.S. 947, at 682–683, 70 S.Ct. 802, 94 L.Ed. 1362.

8. *Anderson v. Shiflett*, 435 F.2d 1036 (10th Cir. 1971) and *Crescent Corporation v. Martin*, 443 P.2d 111 (Okl.1968).

9. *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48 (Okl.1976); *Vacu-Maid, Inc. v. Covington*, 530 P.2d 137, at 141 (Okl.App.1974); *Vemco Plating, Inc. v. Denver Fire Clay Co.*, 496 P.2d 117 (Okl.1972) and *Marathon Battery Company v. Kilpatrick*, 418 P.2d 900 (Okl. 1965).

10. *Geneva Industries, Inc. v. Copeland Construction Corp.*, 312 F.Supp. 186 (N.D.Ill.1970); *Oswalt Industries, Inc. v. Gilmore*, 297 F.Supp. 307 (D.Kan.1969); *Chassis-Trak, Inc. v. Federated Purchaser, Inc.*, 179 F.Supp. 780 (D.N.J. 1960); and *Architectural Bldg. Components Corp. v. Comfort*, 528 P.2d 307 (Okl.1974).

11. See *McQuay, Inc. v. Samuel Schlosberg, Inc.*, 321 F.Supp. 902 (D.Minn.1971).

12. *Whittaker Corporation v. United Aircraft Corporation*, 482 F.2d 1079 (1st Cir. 1973).

13. A New York corporation with its principal place of business in Connecticut with no significant contacts with Oklahoma other than the facts giving rise to the subject action.

ma County District Court and Yankee Metal filed an action seeking a Writ of Prohibition in the Oklahoma Supreme Court. The Writ was denied as the Oklahoma Supreme Court held that although the contacts of Yankee Metal with Oklahoma were only through the mail and over the telephone, the supplying of specifications and samples made Yankee Metal an "active-purchaser" subject to the reach of Oklahoma's "long-arm" statutes.

■ The relationship involved here of lessor-lessee can be closely compared to that of buyer-seller. In this case the CMI machine was already in existence when Mr. Costello came to Oklahoma City for the first time. The specifications he brought with him were for the job he hoped to perform for the City of Rochester and were not specifications for a custom-built product to be made by CMI. In this respect, Costello is distinguishable from the "active-purchaser" in *Yankee Metal Products.*

The plaintiff stresses the fact that its principal manufacturing facility is in Oklahoma, the machine involved herein was manufactured in Oklahoma and that numerous spare parts sent to the defendant were manufactured in Oklahoma. These are all unilateral actions taken on the part of CMI. They do not establish activity on the part of the defendant which would show that he purposefully availed himself of the privilege of conducting activities in Oklahoma to the extent that it could be said that he had invoked "the benefits and protections of its laws". In *Hanson v. Denckla,* supra, the United States Supreme Court pointed out, 357 U.S. at 253, 78 S.Ct. at 1239, that:

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will

vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." [14]

Additionally, the fact that the rental payments were to be sent to Oklahoma, where one was in fact sent, is not significant. It would seem that any purchaser, whether active or passive, would send the consideration for the sale to the office of the resident seller.

■ The plaintiff maintains that the oral contract upon which it brings this action was entered into in Oklahoma. It is not clear from the record whether the parties actually reached an agreement upon Mr. Costello's first visit to CMI's Oklahoma facilities or whether an agreement was formed after defendant Costello had been found the low bidder and Mr. Swisher had inspected the job site in Rochester, New York. Nevertheless, where the contract was entered into is not the controlling point. The controlling question is whether a finding of personal jurisdiction under the facts of a given case violate our "traditional notions of fair play and substantial justice".[15] The Oklahoma Supreme Court has held that this question "is not intended to be answered by reference solely to whether the contract was executed in Oklahoma or was subject to the substantive laws of Oklahoma".[16]

■ The fact that an agent of the defendant corporation came to Oklahoma on one occasion to view the equipment and on another occasion to discuss the controversies which had arisen between the parties does not establish contacts on the part of the defendant sufficient to subject the de-

**14.** See also *Anderson v. Shiflett,* 435 F.2d 1036 (10th Cir. 1971); *Oklahoma Publishing Co. v. National Sportsmen's Club, Inc.,* 323 F.Supp. 929 (W.D.Okl.1971); *Architectural Building Components Corporation v. Comfort,* 528 P.2d 307 (Okl.1974); and *Crescent Corporation v. Martin,* 443 P.2d 111 (Okl.1968).

**15.** *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

**16.** *Crescent Corporation v. Martin,* 443 P.2d 111 (Okl.1968) at 115.

fendant to the jurisdiction of this Court.[17] There is nothing in the record which would indicate that the controversy here arose from any of the acts of the defendant corporation with respect to the State of Oklahoma. Rather, it appears that the controversy arose from the performance of the rented machine at the job site in Rochester, New York.

The plaintiff strongly relies on the case of *Fidelity Bank, N. A. v. Standard Industries, Inc.*, 515 P.2d 219 (Okl.1973). That case involved a breach of contract to lease Texas property. The defendants were foreign corporations and the plaintiff was an Oklahoma corporation. The evidence in that case established substantial written correspondence between the plaintiff and the defendants leading up to and arriving at a contract for the lease of property located in Texas. At first blush, it would appear that this correspondence established the only contacts of the defendants with Oklahoma. However, the decisive factor in the Oklahoma Supreme Court's decision to subject the defendants to the jurisdiction of the Oklahoma courts was the fact that the defendants' acts and representations had caused legal services to be rendered in Oklahoma and the plaintiff had incurred out-of-pocket expenses for the drafting of legal documents under which the defendants would have leased the Texas property. The Court intimated that if the plaintiff could establish these expenses at trial the defendants would be obligated to pay for them. The Court concluded that the defendants had therefore transacted business in Oklahoma.

The Court concludes that defendant Costello stands in the shoes of a "passive-purchaser" and that to subject it to the personal jurisdiction of this Court would violate our traditional notions of fair play and substantial justice. Therefore, the defendant's

Rule 12(b)(2) Motion to Dismiss for lack of jurisdiction over the person of the defendant is granted. This conclusion as to jurisdiction over the defendant obviates the necessity for an examination of the question of whether venue is proper in this district.

It is so ordered this 27th day of October, 1977.

---

17. See *Oklahoma Publishing Co. v. National Sportsmen's Club, Inc.*, 323 F.Supp. 929 (W.D. Okl.1971), where the defendant Texas corporation sent an agent to Oklahoma to view the magazine as it came off the press, and *Oswalt Industries, Inc. v. Gilmore*, 297 F.Supp. 307 (D.Kan.1969) where defendant Gilmore came to Kansas from Georgia to examine new farm equipment manufacturing facilities. *Oklahoma Publishing Co.* involved a dispute over the contract to print the magazine and *Oswalt* was a contract suit involving the sale of farm machinery fromthe resident plaintiff to the non-resident defendant.