**SII MEGADIAMOND, INC., a Delaware corporation, Plaintiff and Appellant,**

v.

**AMERICAN SUPERABRASIVES CORP., a New York corporation; American Superabrasives Corp., a New Jersey corporation; Thomas M. Corcoran, an individual; and Christopher Danielak, an individual, Defendants and Appellees.**

No. 970212.

Supreme Court of Utah.

Oct. 20, 1998.

Bruce P. Badger, Salt Lake City, for plaintiff.

Greggory J. Savage, Salt Lake City, and Earl G. Rhodes, Grand Junction, CO, for defendants.

HOWE, Chief Justice:

SII MegaDiamond, Inc., located in Provo, Utah, appeals from the trial court's dismissal of its suit on the basis of lack of personal jurisdiction. The suit sought to recover payment due from a New Jersey distributor that purchased industrial diamond products on 170 invoices ordered via fax and telephone.

## FACTS

In February 1995, plaintiff SII MegaDiamond, Inc. ("SII"), a Utah-based manufacturer of industrial diamonds, and defendant American Superabrasives Corp. ("ASC"), then a New York corporation with its offices in New Jersey, signed a three-year nonexclusive distribution agreement covering the United States and six foreign countries. ASC, the distributor, projected that sales would total $2.6 million in 1995 alone. During the following two years, ASC placed orders by telephone and fax and paid by checks made payable to SII in Provo, Utah. SII shipped orders from Provo either to ASC in New Jersey or directly to ASC's customers. However, during the period between October 1995 and July 1996, ASC failed to pay 170 of the invoices, totaling $118,000.

In March 1995, unbeknownst to SII, ASC underwent a corporate dissolution in New York and shortly thereafter reincorporated in New Jersey under the same name and at the same business address ("ASC II"). During the dissolution period, SII continued to receive payments by check from ASC.

On August 9, 1996, SII filed this action against ASC in the fourth district court, joining as defendants corporate officers Thomas Corcoran and Christopher Danielak and seeking to recover payment on the delinquent invoices. Defendants removed the case to the United States District Court for the District of Utah and filed their answer to the complaint from which SII first learned of the dissolution and reincorporation. The answer did not object to jurisdiction in the federal court but stated, "Defendants allege as a separate affirmative defense that should this matter be remanded to state court, such court lacks personal jurisdiction over defendants." The United States District Court concluded that the removal was untimely and remanded the case to the fourth district court. SII then amended its complaint, designating ASC predissolution as ASC I and post-reformation as ASC II.[1]

ASC moved for dismissal of the amended complaint, arguing that the court had no jurisdiction over it under Utah Code Ann. § 78–27–24, Utah's long-arm statute, and also under the right to due process guaranteed under Amendment XIV, Section 1 of the United States Constitution. Section 78–27–24 provides in relevant part:

> Any person ..., whether or not a citizen or resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any claim arising from:
>
> (1) The transaction of any business within this state....

The district court heard oral arguments, concluded that ASC lacked sufficient minimum contacts with Utah to support jurisdiction, and granted its motion to dismiss, relying on

---

1. For purposes of discussion, we will refer to ASC I and ASC II collectively as ASC and differentiate only where necessary.

uncontested documentary evidence. The court founded its decision primarily on *Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309 (8th Cir.1982) (decided under Missouri law) and other cases decided prior to the United States Supreme Court's benchmark decision in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

## ANALYSIS

The "ultimate ruling on an issue of jurisdiction is one of law as applied to facts as properly determined." *Transamerica Title Ins. Co. v. United Resources, Inc.*, 24 Utah 2d 346, 348, 471 P.2d 165, 167 (1970). Therefore, we grant no deference to the conclusions of the trial court. *Ross v. Schackel*, 920 P.2d 1159, 1162 (Utah 1996).

ASC contends that it did not transact business in Utah as defined by the long-arm statute and that it lacked sufficient minimum contacts with Utah to support jurisdiction under the Fourteenth Amendment guarantee of due process of law.[2] It relies heavily on cases decided before the United States Supreme Court's 1985 decision in *Burger King* rather than on post–1985 cases from this court or from the United States Supreme Court. We note that *Burger King* enunciated the current standard for determining whether "sufficient minimum contacts" exist to satisfy due process. Therefore, we base our decision on post-*Burger King* law from this court and the United States Supreme Court.

## I. SPECIFIC PERSONAL JURISDICTION UNDER THE UTAH LONG–ARM STATUTE AND FOURTEENTH AMENDMENT DUE PROCESS

The legislature has expressly stated an intent "to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Utah Code Ann. § 78–27–22. This court has explicitly upheld that policy. *See Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1110 (Utah 1985) (citing *Brown v. Carnes Corp.*, 611 P.2d 378, 380 (Utah 1980)). Therefore, we frequently make a due process analysis first because any set of circumstances that satisfies due process will also satisfy the long-arm statute. *See Arguello v. Industrial Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992); *Parry v. Ernst Home Ctr. Corp.*, 779 P.2d 659, 661 (Utah 1989); *Bradford v. Nagle*, 763 P.2d 791, 793 (Utah 1988). In this case, however, we are asked to determine whether business conducted exclusively through remote means can qualify as "transaction of any business within this state." Recent developments in technology and in Utah law make this a vital question.[3] Consequently, we will first examine jurisdiction under section 78–27–24(1).

### A. Jurisdiction Under the Long–Arm Statute

ASC denies that it has transacted any business within Utah. However, in *Synergetics*, we noted that section 78–27–23(2) defines " 'transaction of business within the state' " as " '[t]he activities of a nonresident person, his agents, or representatives in this state which affect persons or businesses within the State of Utah.' " 701 P.2d at 1110. The parties in that case contracted to exchange an ocean-going sailboat for a parcel of real property in Canada. Although the property was not within the state, we held that the negotiation, drafting, and signing of a single modified contract in Utah constituted the transaction of business sufficient to support jurisdiction. In the instant case, the parties did not formally execute a written contract while physically within the state. However, the Supreme Court held in *Burger King* that jurisdiction "may not be avoided merely be-

---

**2.** Section one of United States Constitution Amendment XIV provides, "No state ... shall ... deprive any person of life, liberty or property, without due process of law...."

**3.** In 1996, Utah became the first state to enact legislation specifically governing "digital signatures"—a technology designed to assure the authenticity and privacy of electronic communications and transactions. *See* Utah Code Ann. §§ 46–3–101 to –504. Predictably, as electronic communications become increasingly private and secure, a greater proportion of business transactions will utilize this technology and jurisdiction will be a critical issue.

cause the defendant did not *physically* enter the forum State" if other contacts are sufficient. 471 U.S. at 476, 105 S.Ct. 2174 (emphasis in original).

Although the distribution agreement was not a contract per se, since neither party was bound to perform, each order that ASC sent and SII received in Utah was an offer to form a contract. "The offer of a promise for an act takes place . . . in the sending of an order for goods to a merchant or manufacturer." 17 C.J.S. *Contracts* § 36(1) (1963). SII's shipment of goods in response to an order constituted acceptance of ASC's offer. "Under the Uniform Commercial Code an order or offer to buy goods for prompt or current shipment may be accepted either by shipping the goods or promptly promising to do so. . . ." 67 Am.Jur.2d *Sales* § 145 (1985) (footnotes omitted); *see also* 17 C.J.S. *Contracts* § 41(d) (1963) ("An acceptance of an offer may be by act. . . . In such a case, performance is the only thing needful to complete the agreement and to create a binding promise. . . ."). "In cases involving a contract which possesses possible elements in two or more jurisdictions . . . the place where the last act is done which is necessary to complete the contract and give it validity is generally regarded as the place in which the contract is made." 16 Am.Jur.2d *Conflict of Laws* § 97 (1998) (footnotes omitted). Therefore, "[a]n informal contract consisting of an offer in one state and an acceptance in another is usually regarded as having been made in the latter state." *Id.* § 98 (footnote omitted).

■ Here, both the receipt of the offer and the "last act" needed to form the contract occurred in Utah. Furthermore, payment to SII constituted ASC's performance of its contractual promise, and default constituted breach of the contract. Consequently, the orders and shipments constituted hundreds of individual contracts, all formed and performed, or with performance due, in Utah, and all bound together into a course of business by the distribution agreement. As we held in *Synergetics,* the formation of a contract within a state involving a state resident qualifies as transaction of business for purposes of the long-arm statute.

Additionally, other connections are stronger in the instant case than in *Synergetics.* SII is located in Provo, Utah. The parties signed a three-year distribution agreement that ASC considered significant enough to set out on its letterhead. ASC subsequently produced a sales forecast of $2.6 million for 1995 alone and represented that it would hire a full-time marketer to promote the SII products. Thereafter, almost weekly orders and shipments followed. These transactions pertained to the distribution agreement and therefore constituted part of a course of business, not isolated events. In short, pursuant to a three-year commercial agreement involving a Utah-based corporation, ASC submitted continuous orders for a product manufactured in Utah. The orders were received in Utah, filled in Utah, and invoiced in Utah, and the products were shipped from Utah. ASC mailed its payments to Utah, and its default on the payments injured a corporation. All of these activities "affect[ed] persons or businesses within the State of Utah." *Synergetics,* 701 P.2d at 1110.

Nonetheless, ASC relies on *CPC–Rexcell, Inc. v. La Corona Foods, Inc.,* 912 F.2d 241, 242 (8th Cir.1990), to argue that fax and telephone orders cannot establish minimum contacts. In that case, the court found that the plaintiff could not establish jurisdiction over the defendant in the Missouri courts when the orders were sent to Missouri, paperwork was processed there, and payments were mailed to a Missouri post office box. However, the orders were actually shipped from North Carolina to warehouses in Arizona and California. CPC–Rexcell personnel located in Arizona and California managed any problems in the shipment or manufacture of the goods, and the company was incorporated in Delaware. Thus it was unlikely that the mail and fax transactions affected people or businesses within Missouri.

■ The Supreme Court clarified the role of mail and wire transactions in *Burger King,* stating:

> [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines,

thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

471 U.S. at 476, 105 S.Ct. 2174 (citations omitted). This is more true today than it was in 1985 when *Burger King* was decided. Expanding business opportunities unfortunately give rise to expanding opportunities for breach of contract, injury, and fraud. More than ever, "the public interest demands [that] the state provide its citizens with an effective means of redress against nonresident persons, who, through certain significant minimal contacts with this state, incur obligations to citizens entitled to the state's protection." Utah Code Ann. § 78–27–22. ASC "purposefully directed" its efforts toward residents of Utah as discussed above. We therefore find that ASC transacted business within this state.

## B. Fourteenth Amendment Due Process Requirements

Expanding interstate business and the increasing necessity to protect state residents also gives rise to a converse consideration of due process protection for defendants. ASC expresses a legitimate concern with protecting parties from unforeseeably being haled into court in a foreign jurisdiction regarding a transitory or ephemeral transaction. Therefore, we turn to the analysis of jurisdiction under the due process requirements of the Fourteenth Amendment.

It is well established that jurisdiction must result from " 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Synergetics*, 701 P.2d at 1110 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940))). Consequently, defendant must have " 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Mallory Eng'g, Inc. v. Ted R. Brown & Assocs.*, 618 P.2d 1004, 1008 (Utah 1980) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Specific personal jurisdiction "may be asserted ... 'only on claims arising out of defendant's forum-state activity,' " *Neways, Inc. v. McCausland*, 950 P.2d 420, 423 (Utah 1997) (quoting *Abbott G.M. Diesel, Inc. v. Piper Aircraft Corp.*, 578 P.2d 850, 853 n. 6 (Utah 1978)), and the connection between the defendant and the forum state must be such that the defendant " 'should reasonably anticipate being haled into court there.' " *Synergetics*, 701 P.2d at 1110 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Finally, "the determination of whether Utah can justify asserting jurisdiction over defendants hinges on the balancing of the fairness to the parties and the interests of the State in assuming jurisdiction." *Synergetics*, 701 P.2d at 1110–11 (footnote omitted); *see also Burger King*, 471 U.S. at 478, 105 S.Ct. 2174 (jurisdiction must not put party at severe comparative disadvantage).

■ ASC's transaction of business in Utah, as discussed above, fulfills the requirement of "minimum contacts." Additionally, "[b]y transacting business in this state, [defendant] satisfied the purposeful activity requirement of *Hanson* and *Mallory*." *Synergetics*, 701 P.2d at 1110. ASC purposefully availed itself of the benefits and protections of Utah law when it signed the distribution agreement and commenced a regular course of ordering products from SII. We found in *Synergetics* that "[t]he same conduct establishes the requisite connection between the activity and the cause of action." *Id.* This is also true in the instant case with regard to ASC II. As SII aptly noted in its memorandum in opposition to the motion to dismiss:

> [a]ny nonresident business that confirms that it intends to act as a national and international distributor for a Utah business and then places hundreds of purchase orders for goods that are to be shipped and invoiced from Utah, with full knowledge that it must perform its part of the bargain by paying for the goods in Utah[,]

should not be surprised when it gets haled into court after it fails to pay no fewer than 170 invoices.

ASC relies on *Conn v. Whitmore*, 9 Utah 2d 250, 255, 342 P.2d 871, 874–75 (1959), to support its argument that acquiring jurisdiction from a mail order purchase would jeopardize interstate business by subjecting every such purchaser to jurisdiction in a distant and inconvenient forum. We emphasize that ASC's connection with Utah is not based on isolated or occasional transactions, nor is it a traditional mail order purchase. Rather, ASC engaged as a wholesale purchaser in a regular and continuing course of business with SII pursuant to a three-year distribution agreement. Therefore, the transactions at issue here constitute much more than standard retail mail order purchasers.

■ Turning to the question of fairness to the parties and the interest of the state, we note that "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174. ASC II has presented no such evidence. Furthermore, " '[i]n undertaking interstate business [a defendant] must recognize and accommodate . . . the probability and necessity of litigating in foreign forums.' " *Synergetics*, 701 P.2d at 1111 (quoting *Mallory*, 618 P.2d at 1009 n. 8).

The distribution agreement between SII and ASC covered the United States and six foreign countries. Clearly, ASC was conducting an interstate business. Additionally, the amount in controversy, $118,000, is large enough that ASC II is unlikely to default on its defense due to the burden of defending in a foreign forum. *See id.* Where the "amount in controversy . . . is substantive compared to the costs of litigating the action," there is only minimal possibility of defendants defaulting on the basis that they cannot afford to litigate in the forum. *Id.*

"Balanced against the inconvenience to the defendants is the express interest the state has in ensuring protection to its residents from the acts of nonresidents." *Id.* The legislature has clearly mandated, as discussed above, that the rules of jurisdiction be applied so as to give Utah residents the broadest protection permitted by the federal constitution. Therefore, to borrow the language from *Burger King*, "[w]e cannot conclude that [Utah] had no 'legitimate interest in holding [ASC II] answerable on a claim related to' contacts [it] had established in that State." 471 U.S. at 482–83, 105 S.Ct. 2174 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Accordingly, we hold that Utah's jurisdiction over ASC II accords with Fourteenth Amendment due process of law.

## II. JURISDICTION OVER ASC I AND INDIVIDUAL CORPORATE OFFICERS

### A. Long–Arm Jurisdiction

■ The current controversy arose after the dissolution of ASC I as a New York corporation and its reformation as a New Jersey corporation. The contested invoices relate only to the New Jersey corporation, ASC II. There is no cause of action against ASC I arising out of that corporation's activity in Utah, and specific personal jurisdiction may be exercised only where " 'the cause of action arises out of or has substantial connection with the [in state] activity.' " *Synergetics*, 701 P.2d at 1110 (quoting *Mallory*, 618 P.2d at 1008). Therefore, we hold that this state cannot exercise long-arm jurisdiction over ASC I.

We note, however, that according to the record before us the only difference between the original and successor corporation was the place of incorporation. Even the business address remained the same, and business continued as usual. The corporation did business under the name of ASC both before and after the reformation, and the record does not indicate that any of the documents that SII received were altered. Indeed, ASC did not even notify SII of the change. ASC II continued to function under the original distribution agreement; therefore, its orders for SII products were made pursuant to that agreement. *See* 19 Am.Jur.2d *Corporations* §§ 2631, 2647 (1986) (stating successor cor-

poration succeeds to all obligations, agreements, and assets of original corporation).

■ SII joined corporate officers Corcoran and Danielak as defendants. It contends that Utah has jurisdiction over those individual defendants because they transferred assets from ASC I to ASC II. However, specific personal jurisdiction arises only out of the actual transactions between the defendant and the forum state. "Minimum contacts must be found as to each defendant over whom the court exercises jurisdiction," *Home–Stake Prod. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020 (10th Cir.1990) (citation omitted), and "a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum state." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (citations omitted). Additionally, the contested obligations must "arise out of [and be] connected with the activities within the [forum] state." *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The asset transfer occurred before the present dispute arose and SII has failed to show any connection between the transfer, the dispute, and Utah. Therefore, Utah cannot assume long-arm jurisdiction over Corcoran and Danielak individually.

### B. Voluntary Submission to Jurisdiction

Although we have concluded that the Utah long-arm statute does not provide a basis for the exercise of personal jurisdiction over ASC I, Corcoran, and Danielak by Utah courts, SII nevertheless argues that the state district court erred in dismissing the action against these defendants. In particular, it asserts that these defendants waived their objection to personal jurisdiction by submitting to the federal court's personal jurisdiction without objection.

■ When a federal court acquires subject matter jurisdiction on the basis of diversity, the federal court must apply the law of the forum state, *see Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to determine if a state court would exercise personal jurisdiction over the defendant.[4] And "[i]f the state court lacks jurisdiction of the ... parties, the federal court acquires none...." *Baltimore & Ohio R.R.*, 258 U.S. at 382, 42 S.Ct. 349. A federal court sitting in diversity can render a valid judgment only if the state in which it sits would have had personal jurisdiction over the defendant. Thus, there is only one source of personal jurisdiction law in diversity cases— state law. A federal court sitting in diversity is really an extension of the forum state court. When a defendant consents to personal jurisdiction in a federal court sitting in diversity, that defendant necessarily consents to the forum state's exercise of personal jurisdiction. Allowing a defendant to waive personal jurisdiction in the federal court but later contest the exercise of jurisdiction in a state court is tantamount to allowing a defendant to waive jurisdiction in one district court in Utah but contest it in another district court.

■ The requirement of personal jurisdiction operates to protect defendants from "the burdens of litigating in a distant or inconvenient forum" and acts to "ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a feder-

4. *See Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir.1995) ("To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."); *see also Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 455 (10th Cir.1996); *Mack Trucks, Inc. v. Arrow Aluminum Castings Co.*, 510 F.2d 1029, 1031 (5th Cir.1975) ("In a diversity case such as this one, a federal district court may exercise in personam jurisdiction over a foreign defendant only if a state court could do so in proper exercise of state law, here the long arm statute."); *Garden Homes, Inc. v. Mason*, 238 F.2d 651, 652 (1st Cir.1956) (holding that if state court lacked jurisdiction of parties, federal court acquired none on removal); *Greenberg v. Greenberg*, 954 F.Supp. 213, 215 (D.Colo.1997); *Casad Ry. Servs., Inc. v. Union Pacific R.R.*, 659 F.Supp. 123, 125 (N.D.Ind. 1987); *CMI Corp. v. Costello Constr. Corp.*, 454 F.Supp. 497, 501 (W.D.Okla.1977) (holding that diversity of citizenship only confers subject matter jurisdiction and that "[p]ersonal jurisdiction must be established through contact with the forum").

al system." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–03, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (providing that because "[t]he personal jurisdictional requirement recognizes and protects ... an individual right, it can, like other such rights, be waived"). ASC, ·Corcoran, and Danielak did not try to avoid litigating in a Utah forum; they only wanted to avoid litigating in a Utah state court. They had this option through removal but lost it because of their own untimeliness. Therefore, we hold that they waived any objection to personal jurisdiction of Utah courts over them.

## CONCLUSION

We hold that the district court erred in dismissing SII's action against ASC II on the basis of a lack of personal jurisdiction. The court had jurisdiction over ASC II under our long-arm statute and the exercise of that jurisdiction does not offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The court also erred in dismissing the complaint against ASC I, Corcoran, and Danielak. They waived their objection to jurisdiction by the state court.

Reversed and remanded for further proceedings.

DURHAM, Associate C.J., and ZIMMERMAN, J., concur in Chief Justice HOWE's opinion.

RUSSON, J., concurs in the result.

STEWART, Justice, concurring and dissenting:

I concur with the majority's analysis regarding Utah's long-arm statute. I dissent, however, with respect to the majority's holding that the defendants waived personal jurisdiction by failing to assert lack of personal jurisdiction in federal court. I believe a defendant should be entitled to waive lack of personal jurisdiction in a diversity action in federal court and still assert lack of personal jurisdiction in a·state court, if the matter is remanded by the federal court. Historically,

diversity jurisdiction was predicated on giving an out-of-state defendant a choice to offset any bias that might exist in a state court toward such a defendant. Whether sound or not, we still live with that notion.