2016 UT App 184

# THE UTAH COURT OF APPEALS

GO INVEST WISELY LLC,
Appellee,
*v.*
ODELL BARNES,
Appellant.

Memorandum Decision
No. 20141095-CA
Filed September 1, 2016

Fourth District Court, Provo Department
The Honorable Samuel D. McVey
No. 090403475

Odell Barnes, Appellant Pro Se

Victor A. Sipos, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Memorandum
Decision, in which JUDGES STEPHEN L. ROTH and KATE A. TOOMEY
concurred.

CHRISTIANSEN, Judge:

¶1     Go Invest Wisely LLC (GIW) sued Odell Barnes for
breach of contract, breach of the implied covenant of good faith
and fair dealing, breach of contract implied in fact, breach of
contract implied in law, and unjust enrichment. In response,
Barnes filed a motion to dismiss the suit for lack of personal
jurisdiction. The trial court denied Barnes's motion to dismiss.
Barnes now appeals the trial court's denial of his motion to
dismiss. We affirm.

¶2     In September 2007, GIW, a Utah limited liability
company, and Scott Brown entered into an agreement under
which Brown agreed to purchase properties from Bryce Peters
Financial Corporation (BPFC) on GIW's behalf. Between

September 2007 and January 2008, GIW purchased approximately 200 properties from BPFC through Brown. Around January 2008, GIW and Brown formalized their arrangement with a written agreement authorizing Brown to purchase properties and sign purchase agreements on GIW's behalf. Between February and August 2008, GIW agreed to purchase around 290 properties from BPFC. GIW alleged below that, for approximately 154 of the 290 properties GIW agreed to purchase, BPFC "either (1) did not timely convey the properties to GIW and refuses to refund the amounts GIW paid for those properties, or (2) has never conveyed title to GIW at all."

¶3     In 2009, GIW filed a complaint against BPFC and Odell Barnes. GIW's complaint alleged, in relevant part, that Barnes, a resident of South Carolina, had acted as a broker for the sale of the 290 properties GIW agreed to purchase from BPFC between February and August 2008 and that the parties had agreed Barnes would receive $500 for each property GIW purchased from BPFC. According to GIW, Barnes had failed to "ensure timely conveyance of title to GIW for each of the properties that GIW was to purchase" and GIW was damaged as a result. GIW also alleged that Barnes was "not a licensed real estate broker or agent and [was] not legally entitled to receive commissions for the sale of real property" and that "[t]o permit Barnes to retain the benefit of the funds provided without fully compensating GIW would result in an unconscionable and unjust enrichment of Barnes at GIW's expense."

¶4     Barnes responded to GIW's complaint by filing a motion to dismiss for lack of personal jurisdiction. *See* Utah R. Civ. P. 12(b)(2). He supported the motion with a memorandum and an affidavit. Barnes's affidavit explained:

> 7. I have never been a party to any agreement with [GIW], including any agreement to act as broker on properties purchased by [GIW] from Defendant [BPFC].

8. I am paid a fee of $500.00 solely to facilitate the sale of bank-owned properties to investors, based upon my connection with the banks involved, and for no other service.

9. With respect to the properties that are the subject of this action, I contacted Scott Brown in Arizona, with whom I had previously done business, and negotiated the purchase of properties and my fee with Mr. Brown, without any knowledge of [GIW] or that Mr. Brown anticipated assigning his rights in the properties to [GIW].

10. I had no contact with [GIW], directly or indirectly, concerning the purchase of the properties which are the subject of this action, and I had no knowledge of [GIW] until December of 2008.

Barnes also averred that he (1) resided in South Carolina and has never resided in Utah, (2) did not personally do business in Utah, (3) did not own real property or an interest in any company doing business in Utah, (4) had never reached out personally or on behalf of anyone else to contact GIW, (5) had never contracted to supply services or goods in Utah, and (6) had never contracted to insure any person, property, or risk located within Utah.

¶5      GIW then submitted a memorandum in opposition to Barnes's motion, which was accompanied by two sworn declarations and three exhibits. According to the sworn declaration of Brad Hess, an employee of GIW and the "sole shareholder and director" of a company "which is a manager of [GIW]," Barnes acted as a broker for the properties GIW agreed to purchase from BPFC and the parties agreed Barnes would be paid $500 for each property GIW purchased. Hess declared that "[t]he properties purchased from [BPFC] were not purchased by Brown and then reconveyed to GIW, as suggested by Barnes, but

were purchased by GIW directly from [BPFC]. . . . GIW also made payments directly to [BPFC]." Moreover, "although Brown communicated with Barnes on behalf of GIW, GIW made payments directly under the Brokerage Agreement to Barnes. GIW wired at least $98,500 in funds directly to accounts held by Barnes." Along with his declaration, Hess attached "true and correct copies of representative deeds showing [BPFC] as the grantor and GIW as the grantee" and "statements detailing wire transfers to Barnes." The attached deeds demonstrate a transfer of property directly from BPFC to GIW as a Utah corporation or as a corporation with a Utah mailing address. The attached wire transfers include GIW's mailing address in North Ogden, Utah, and the transfers were routed through Bank of Utah to Barnes.

¶6     According to the sworn declaration of Scott Brown, in 2007 and 2008 Brown worked for GIW to assist it in acquiring real property. Brown declared that Barnes "acted as a broker for the 290 properties, and the parties agreed Barnes would receive $500.00 for each property that was purchased from [BPFC]." According to Brown, he communicated with Barnes regarding GIW's purchases from BPFC and "specifically informed Barnes that it was GIW, and not [Brown himself], that was purchasing the 290 properties. [Brown] also specifically informed Barnes that GIW was a Utah company." Brown also declared that GIW made several payments to Barnes directly and that the properties GIW purchased "were generally deeded from [BPFC] to GIW." Along with his declaration, Brown attached "true and correct copies of email correspondence [he] had with Barnes."

¶7     The trial court ruled on Barnes's motion to dismiss based on the pleadings and documentary evidence, including the "affidavits, declarations, and exhibits submitted by the parties." The court denied Barnes's motion and found that Barnes's "acceptance of $98,500 in payments from GIW, a Utah company, with a Utah mailing address and routed through the Bank of Utah, put him on notice he was dealing with a Utah resident, particularly when Mr. Brown told him GIW was a Utah company. . . . [B]ased solely on the information contained in the

wire transfer documents, Mr. Barnes knew or should have known that he was dealing with a Utah resident." The court also found that

> Mr. Barnes, acting as the broker for a series of real-estate transaction[s] knew or should have known that at least 19 of the properties for which he acted as broker were titled in the name of GIW[,] an LLC with a Utah address.
>
> Mr. Barnes knew before December of 2008 he was dealing with GIW as a Utah resident through its agent, Mr. Brown. Mr. Brown asserts that Mr. Barnes was informed of the existence and nature of GIW, and Mr. Barnes had access to documentary evidence of the Utah wire transfers and real estate transactions which put him on notice of the existence and location of GIW as his client, regardless of what Mr. Brown did or did not say.

The court then concluded that Barnes "established an ongoing business relationship with GIW over a period of months beginning in late 2007 or early 2008 and continuing through at least September of 2008" and that Barnes had "sufficient minimum contacts with the State of Utah such that [he] is subject to specific personal jurisdiction in the State of Utah in this matter."[1] Barnes now appeals the trial court's denial of his motion to dismiss.

---

1. Later, following a one-day bench trial, the trial court found that Barnes had "perform[ed] broker activities, without having the required license" and that "Barnes must disgorge and return to GIW all compensation he received from GIW." The trial court entered judgment against Barnes for $976,500 plus prejudgment interest.

¶8    On appeal, Barnes contends that the trial court erred in denying his motion to dismiss for lack of personal jurisdiction under Utah's long-arm statute and that the court's exercise of personal jurisdiction violated the due process requirements of the Fourteenth Amendment to the United States Constitution.[2]

¶9    "In determining questions of jurisdiction, a trial court may, in its discretion, hold an evidentiary hearing, or base its decision on documentary evidence alone (pleadings, affidavits, and/or discovery)." *Kamdar & Co. v. Laray Co.*, 815 P.2d 245, 247 (Utah Ct. App. 1991). "[I]f the matter is to be determined on the documentary evidence alone, the plaintiff must simply make a prima facie showing of personal jurisdiction." *Id.* at 248. "The plaintiff's factual allegations are accepted as true unless specifically controverted by the defendant's affidavits or by depositions, but any disputes in the documentary evidence are resolved in the plaintiff's favor." *Anderson v. American Society of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990). "An appeal from a pretrial jurisdictional decision made only on documentary evidence presents legal questions which we review

---

2. GIW contends that "Barnes waived any defense based on lack of personal jurisdiction by invoking the trial court's jurisdiction for his own purpose." Specifically, GIW claims that Barnes waived his right to challenge the trial court's jurisdiction over him when he filed a permissive third-party complaint against Brown. However, Barnes filed his third-party complaint against Brown *after* the trial court denied his motion to dismiss. Pursuant to rule 12(b) of the Utah Rules of Civil Procedure, "[n]o defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion *or by further pleading after the denial of such motion or objection*." Utah R. Civ. P. 12(b) (emphasis added). Consequently, we reject GIW's waiver argument.

for correctness." *Fenn v. Mleads Enters., Inc.*, 2006 UT 8, ¶ 7, 137 P.3d 706.[3]

¶10    "The authority of the state to hale a nonresident into a state court hinges on the ability to establish personal jurisdiction." *ClearOne, Inc. v. Revolabs, Inc.*, 2016 UT 16, ¶ 7, 369 P.3d 1269 (citation and internal quotation marks omitted). While there are two categories of personal jurisdiction—general and specific—only the latter is relevant here, as both parties agree that Barnes is not subject to general personal jurisdiction in Utah. *See id.* Specific personal jurisdiction "gives a court power over a defendant only with respect to claims arising out of the particular activities of the defendant in the forum state." *Arguello v. Industrial Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992). Consequently, "personal jurisdiction is only proper if we determine that (1) the Utah long-arm statute extends to

---

3. "Unless an evidentiary hearing is held, the plaintiff must prove jurisdiction at trial by a preponderance of the evidence after making a prima facie showing before trial." *Anderson v. American Society of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990). On appeal, Barnes does not assert that GIW failed to establish personal jurisdiction by a preponderance of the evidence at trial, and nothing in the parties' briefing indicates that Barnes raised the issue of personal jurisdiction again during trial. Accordingly, we limit our review to the only issues Barnes actually raised below: whether GIW made a prima facie showing of personal jurisdiction and whether the trial court erred in denying Barnes's motion to dismiss for lack of personal jurisdiction. *Cf. Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1319 (9th Cir. 1998) ("Having failed to contest the issue further after losing their motion to dismiss, defendants may appeal only the district court's holding that plaintiffs made out a *prima facie* case sufficient to support an exercise of personal jurisdiction."). As a result, we do not consider the trial transcript or exhibits GIW references in its briefing.

defendant's acts or contacts, (2) plaintiff's claim arises out of those acts or contacts, and (3) the exercise of jurisdiction satisfies the defendant's right to due process under the United States Constitution." *Fenn*, 2006 UT 8, ¶ 8.

¶11    Barnes contends that "[i]t is clear from the record that [he] has not transacted business in the State of Utah" as defined by Utah's long-arm statute. Pursuant to Utah's long-arm statute, a person is subject to Utah's jurisdiction if the person performs one of several enumerated acts. *See* Utah Code Ann. § 78B-3-205 (LexisNexis 2012). The relevant provision of the long-arm statute provides for personal jurisdiction over nonresidents as follows:

> [A]ny person . . . , whether or not a citizen or resident of this state, who, in person or through an agent, does any of the following enumerated acts is subject to the jurisdiction of the courts of this state as to any claim arising out of or related to:
>
> (1) the transaction of any business within this state[.]

*Id.* "The words 'transaction of business within this state' mean activities of a nonresident person, his agents, or representatives in this state which affect persons or businesses within the state." *See id.* § 78B-3-202(2).

¶12    Pursuant to section 78B-3-201 of the Utah Code, the long-arm statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." *Id.* § 78B-3-201(3). Given the long-arm statute's breadth, "we often assume the application of the statute—and go straight to the due process issue." *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 19, 201 P.3d 944 (citation and internal quotation marks omitted); *see also Arguello*, 838 P.2d at 1122 ("We assume that . . . subparagraph (1) . . . of the long-arm statute will be satisfied if Utah's exercise of specific personal

jurisdiction over [the defendant] satisfies due process."). Accordingly, we follow that approach here and proceed to the due process issue.[4]

¶13 "Federal due process requires that in order to subject a defendant to specific personal jurisdiction, there must be 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Pohl*, 2008 UT 89, ¶ 23 (alteration in original) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). To establish minimum contacts, "the defendant must have purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *MFS Series Trust III ex rel. MFS Mun. High Income Fund v. Grainger*, 2004 UT 61, ¶ 10, 96 P.3d 927 (brackets, citation, and internal quotation marks omitted). "'Courts often determine purposeful availment by considering whether the defendant deliberately created some relationship with the forum state that would serve to make that state's potential exercise of jurisdiction foreseeable.'" *Hunsaker v. American HealthCare Capital*, 2014 UT App 275, ¶ 16, 340 P.3d 788 (quoting *Fenn*, 2006 UT 8, ¶ 13). "That is, 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

¶14 "Generally, a party purposefully avails itself of the benefits of conducting business in a state by deliberately

---

4. "Concluding that a defendant's contacts with the jurisdiction meet the requirements of the long-arm statute also satisfies the second element of *Fenn*'s three-part test—that the plaintiff's claim arises out of a defendant's acts or contacts with the state." *Hunsaker v. American HealthCare Capital*, 2014 UT App 275, ¶ 14 n.2, 340 P.3d 788 (citing *Fenn v. Mleads Enters., Inc.*, 2006 UT 8, ¶ 8, 137 P.3d 706).

engaging in significant activities within the state or by creating 'continuing obligations between himself and residents of the forum.'" *Fenn v. Mleads Enters., Inc.*, 2006 UT 8, ¶ 13, 137 P.3d 706 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). "Purposeful availment does not require physical presence in the jurisdiction[.]" *Hunsaker*, 2014 UT App 275, ¶ 17; *see also Burger King*, 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.").

¶15    Our review of the record, including the parties' affidavits, declarations, and exhibits, leads us to conclude that GIW made a prima facie showing of personal jurisdiction in this case. To begin with, the documentary evidence indicates that Barnes purposefully availed himself of the privilege of conducting business in Utah, *see Grainger*, 2004 UT 61, ¶ 10, when Barnes contacted Brown regarding "the properties which are the subject of this action" and acted as a broker for the approximately 290 properties GIW agreed to purchase from BPFC between February and August 2008, *see Burger King*, 471 U.S. at 473 ("[W]ith respect to interstate contractual obligations, . . . parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." (citation omitted)). In his affidavit, Barnes acknowledged that he "negotiated the purchase of properties and [his] fee" with Brown, but Barnes averred that he did so without any knowledge of GIW or knowledge "that [Brown] anticipated assigning his rights in the properties to [GIW]." However, Brown declared that he "specifically informed Barnes that it was GIW, and not [Brown himself], that was purchasing the 290 properties." Additionally, Brown "specifically informed Barnes that GIW was a Utah company." As noted, *supra* ¶ 9, "any disputes in the documentary evidence are resolved in the plaintiff's favor." *See Anderson v. American Society of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990).

¶16 Moreover, although Barnes averred that he had "no knowledge of [GIW] until December of 2008," the wire transfer documents attached to Hess's declaration demonstrate that GIW itself wired $66,000 to Barnes on August 28, 2008; $8,000 on September 2, 2008; $16,500 on September 15, 2008; and $8,000 on October 14, 2008. Thus, a total of $98,500 was wired to Barnes, directly from GIW, before December 2008. The wire transfers were routed through Bank of Utah and included GIW's name and mailing address in North Ogden, Utah. In addition, the representative deeds attached to Hess's declaration demonstrate that at least nineteen of the properties for which Barnes acted as broker were titled in the name of GIW and not Brown, as suggested by Barnes. Consequently, Barnes's claim that he was unaware of GIW until December 2008 is squarely contradicted by the documentary evidence. The documentary evidence indicates that Barnes and GIW had an ongoing business relationship between February and August 2008, and that Barnes derived substantial benefits from that relationship. By providing continuing brokerage services to GIW, which operates its business in Utah, Barnes "purposefully avail[ed] [himself] of the privilege of conducting activities" within Utah. *See Grainger*, 2004 UT 61, ¶ 10 (first alteration in original) (citation and internal quotation marks omitted).

¶17 The documentary evidence also indicates that "the litigation results from alleged injuries that arise out of or relate to" Barnes's forum-related activities. *See Burger King*, 471 U.S. at 472 (citation and internal quotation marks omitted). GIW's breach of contract claims arose from Barnes contacting Brown and acting as broker for the properties GIW agreed to purchase from BPFC between February and August 2008. In its complaint, GIW alleged that Barnes breached the terms of the parties' brokerage agreement by "failing to ensure timely conveyance of title to GIW for each of the properties that GIW was to purchase" and that it was damaged as a result. GIW also alleged that "Barnes is not a licensed real estate broker or agent and is not legally entitled to receive commissions for the sale of real property" and that Barnes would be unjustly enriched at GIW's

expense if he were allowed to retain said commissions. Consequently, GIW raised a prima facie argument that its claims "arise out of" Barnes's contacts with GIW, a Utah LLC. *See Burger King*, 471 U.S. at 472 (citation and internal quotation marks omitted).

¶18   Although this is an admittedly close case, it appears as though Barnes "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *MFS Series Trust III ex rel. MFS Mun. High Income Fund v. Grainger*, 2004 UT 61, ¶ 10, 96 P.3d 927 (first alteration in original) (citation and internal quotation marks omitted). Moreover, "the litigation results from alleged injuries that arise out of or relate to" Barnes's forum-related activities. *See Burger King*, 471 U.S. at 472 (citation and internal quotation marks omitted). Consequently, we conclude that Barnes had sufficient minimum contacts with Utah to support the trial court's exercise of personal jurisdiction over Barnes.[5]

---

5. Relying on *Walden v. Fiore*, 134 S. Ct. 1115 (2014), Barnes contends that "[t]he contacts required simply cannot be with the plaintiff alone." According to Barnes, "[t]he record is devoid of any evidence that [he] has engaged in any conduct or activities in the State of Utah, or had contacts with the State of Utah with anyone other than plaintiff." Barnes's reliance on *Walden* is misplaced, as *Walden* is factually distinguishable from this case. In *Walden*, the Supreme Court held that a Georgia resident did not create sufficient contacts with the state of Nevada by committing a tort in Georgia against Nevada residents traveling in Georgia and by receiving unilateral communications from the Nevada residents and their Nevada counsel. *Id.* at 1125–26. Simply put, in *Walden*, the defendant directed his activities at Nevada plaintiffs who incidentally happened to be in Georgia.

(continued…)

¶19 Finally, "the determination of whether Utah can justify asserting jurisdiction over defendants hinges on the balancing of the fairness to the parties and the interests of the State in assuming jurisdiction." *SII MegaDiamond, Inc. v. American Superabrasives Corp.*, 969 P.2d 430, 435 (Utah 1998) (citation and internal quotation marks omitted). The Utah Supreme Court has noted that "'where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* at 436 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Barnes has presented no such evidence. Moreover, "in undertaking interstate business a defendant must recognize and accommodate the probability and necessity of litigating in foreign forums." *Id.* (ellipsis, brackets, citation, and internal quotation marks omitted). Resolving disputes in the parties' documentary evidence in GIW's favor, as we must, *supra* ¶ 9, the record indicates that Barnes was conducting interstate business. Barnes, a resident of South Carolina, reached out to Brown regarding "the properties which are the subject of this action" and acted as a broker for the properties GIW agreed to purchase from BPFC between February and August 2008 in exchange for $500 per property that GIW agreed to purchase. And Brown "specifically informed Barnes that it was GIW, and not [himself], that was purchasing the 290 properties" and "that GIW was a Utah company."

¶20 Turning to the interest of the state, our legislature has "clearly mandated . . . that the rules of jurisdiction be applied so as to give Utah residents the broadest protection permitted by the federal constitution." *SII MegaDiamond*, 969 P.2d at 436; *see also id.* ("Balanced against the inconvenience to the defendants is the express interest the state has in ensuring protection to its

---

(…continued)
However, in this case, Barnes chose to continuously direct his activities at an entity known to be in Utah.

residents from the acts of nonresidents." (citation and internal quotation marks omitted)). Thus, we cannot conclude that Utah "had no legitimate interest in holding [Barnes] answerable on a claim related to contacts [he] had established" in this state. *See id.* (citation and internal quotation marks omitted). Accordingly, we are satisfied that the exercise of jurisdiction satisfies Barnes's right to due process under the United States Constitution. *See Fenn v. Mleads Enters., Inc.*, 2006 UT 8, ¶ 8, 137 P.3d 706.

¶21    Because the trial court's decision on Barnes's motion to dismiss was based on documentary evidence alone, GIW was only required to "make a prima facie showing of personal jurisdiction." *Kamdar & Co. v. Laray Co.*, 815 P.2d 245, 248 (Utah Ct. App. 1991). We conclude that GIW met the prima facie threshold requirement, demonstrating that Barnes established a substantial connection with Utah such that he should have reasonably anticipated being haled into court here. *See Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 23, 201 P.3d 944. Accordingly, we affirm the order of the trial court.

———————