**2018 UT App 4**

## THE UTAH COURT OF APPEALS

KERI VENUTI, DANA VENUTI, AND CORINNE RUBIO,
Appellees,
*v.*
CONTINENTAL MOTORS INC.,
Appellant.

Opinion
No. 20160645-CA
Filed January 5, 2018

Third District Court, Salt Lake Department
The Honorable Bruce C. Lubeck
No. 160902043

Heidi G. Goebel, Timothy J. Curtis, Sherri R. Ginger,
and Timothy A. Heisterhagen, Attorneys
for Appellant

Craig G. Adamson, Joelle S. Kesler, and Cynthia M.
Devers, Attorneys for Appellees

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES
GREGORY K. ORME and KATE A. TOOMEY concurred.

HAGEN, Judge:

¶1     This lawsuit stems from a deadly helicopter crash in Utah allegedly caused by a defective engine part manufactured by Continental Motors, Inc. (CMI). CMI, a nonresident corporation, moved to dismiss for lack of personal jurisdiction. The district court denied the motion, concluding that CMI had sufficient minimum contacts with Utah to support specific jurisdiction. Because CMI's minimum contacts with Utah are not suit-related, we reverse.

BACKGROUND

¶2     Robin Venuti and Albert Rubio were killed in a helicopter crash near Green River, Utah, on April 6, 2014. The guardians of each victim's children and the personal representatives of their estates (collectively, Plaintiffs) sued several defendants, including CMI, a Delaware corporation with its principal place of business in Mobile, Alabama. Plaintiffs alleged that the crash was caused by, among other things, a defective engine part manufactured by CMI. Specifically, Plaintiffs claimed that a CMI magneto[1] used in the helicopter's ignition system caused the engine to lose power during flight.

¶3     Nothing in the record suggests that CMI sold the allegedly defective magneto—or any other magneto—in Utah. While the record does not identify the original purchaser, it does indicate that the magneto was acquired at some point by Aircraft Electrical, a California company. In 2001, Aircraft Electrical overhauled the magneto at its California facility and then transferred it to Nevada Aircraft, a Nevada company. Nevada Aircraft overhauled the helicopter's engine at its facility in Nevada, installing the magneto overhauled by Aircraft Electrical. The magneto appears to have entered Utah when Nevada Aircraft sold the engine to Upper Limit Aviation, a Utah company.

¶4     CMI filed a motion to dismiss the claims against it for lack of personal jurisdiction. In support of its motion, CMI filed an affidavit from its chief financial officer stating that CMI is not

---

1. A magneto or "magnetoelectric machine" is "an alternator with permanent magnets used to generate current for the ignition in an internal combustion engine." *Magneto*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/magneto [https://perma.cc/XY2S-6WKX].

licensed to do business in Utah and maintains no "offices, places of business, post office boxes[,] or telephone listings in Utah." CMI does not have "a registered agent for service of process in Utah," nor does it "have any warehouses, repair stations, agents, dealers, or other sales representatives located in Utah." In addition, CMI has "no real estate, bank accounts, or other interests in property in Utah" and "did not incur any obligation to pay, and has not paid, income taxes in Utah." CMI also represented that it "has not conducted any regular ongoing advertising, solicitation, marketing, or other sales promotions directed toward residents of Utah."

¶5    In response, Plaintiffs asserted that CMI should be subject to the court's jurisdiction because it "regularly does business in Utah" and "CMI's business in this State caused this accident in Utah." Among CMI's business activities in Utah, Plaintiffs cited its collection of customer demographic information for marketing purposes, its "ongoing business relationship" with eight fixed-base operators[2] in Utah, and CMI's advertisements in nationally circulated publications. Plaintiffs also alleged that CMI ships parts and literature into Utah, offers services to Utah residents, and receives "money from those businesses in this State who order goods, services[,] and parts." Plaintiffs asserted that they had established a prima facie showing of jurisdiction on the affidavits but requested discovery if the court determined otherwise.

---

2. The term "fixed-base operator" refers to a commercial business allowed to operate on an airport's property. A "certified repair station offering engine maintenance, repair and replacement to retail customers or fleet operators" may sign up to be listed as a fixed-base operator on CMI's website by completing an online form and paying an annual fee.

¶6　After considering the briefs and oral arguments, the district court denied the motion to dismiss. Noting that there was no dispute that the court lacked general personal jurisdiction over CMI, it focused instead on the question of whether CMI was subject to the court's specific personal jurisdiction for this particular case. The court ruled that Plaintiffs had made a prima facie showing of specific jurisdiction because CMI transacts business in Utah and, "[w]hile those contacts may not give rise to the cause of action, they do relate to the cause of action alleged herein." Furthermore, the court found that requiring CMI "to respond in a Utah court does not offend traditional notions of fair play and substantial justice," because CMI directed its business to Utah and Plaintiffs have a strong interest in adjudicating the dispute in Utah. CMI filed an interlocutory appeal challenging the court's denial of its motion to dismiss.

ISSUE AND STANDARD OF REVIEW

¶7　At issue in this case is whether Plaintiffs made a prima facie showing of personal jurisdiction over CMI. "Where a pretrial jurisdictional decision has been made on documentary evidence only, an appeal from that decision presents only legal questions that are reviewed for correctness." *Arguello v. Industrial Woodworking Mach. Co.*, 838 P.2d 1120, 1121 (Utah 1992), *modified on other grounds by State ex rel. W.A.*, 2002 UT 127, 63 P.3d 607. The district court's decision is "reviewed de novo, giving no deference to the trial court's conclusion." *Salt Lake City v. Silver Fork Pipeline Corp.*, 913 P.2d 731, 733 (Utah 1995).

ANALYSIS

¶8　To subject a nonresident defendant to a court's judgment, the court must have personal jurisdiction. *Gardner v. SPX Corp.*, 2012 UT App 45, ¶ 12, 272 P.3d 175. Where the court bases its

decision on documentary evidence alone, "the plaintiff must simply make a prima facie showing of personal jurisdiction." *Go Invest Wisely LLC v. Barnes*, 2016 UT App 184, ¶ 9, 382 P.3d 623 (citation and internal quotation marks omitted). "The plaintiff's factual allegations are accepted as true unless specifically controverted by the defendant's affidavits or by depositions, but any disputes in the documentary evidence are resolved in the plaintiff's favor." *Id.* (citation and internal quotation marks omitted).

¶9 There are two types of personal jurisdiction: general and specific. "General personal jurisdiction permits a court to exercise power over a defendant without regard to the subject of the claim asserted. For such jurisdiction to exist, the defendant must be conducting substantial and continuous local activity in the forum state." *Arguello*, 838 P.2d at 1122 (emphasis omitted). Plaintiffs do not claim that CMI is subject to general personal jurisdiction in Utah.

¶10 "[S]pecific personal jurisdiction gives a court power over a defendant only with respect to claims arising out of the particular activities of the defendant in the forum state. For such jurisdiction to exist, the defendant must have certain minimum local contacts." *Id*. (emphasis omitted). To determine whether a state court can exercise specific jurisdiction, courts conduct a two-part inquiry: (1) do the plaintiff's claims come within the reach of the state's long-arm statute, and (2) are the defendant's contacts with the state sufficient to satisfy constitutional due process? *See id.* "If the relevant state statute does not permit jurisdiction, then the inquiry is ended; if it does, then the question is whether the statute's reach comports with due process." *Id.*

¶11 Utah's long-arm statute "provides that a nonresident may become subject to the jurisdiction of Utah courts by transacting business or causing injury within the state." *Gardner*, 2012 UT App 45, ¶ 14. The legislature has directed us to construe this

statute "so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Utah Code Ann. § 78B-3-201 (LexisNexis 2012). As a result, Utah courts often assume that the long-arm statute will be satisfied if the exercise of specific jurisdiction comports with due process. *See, e.g.*, *Arguello*, 838 P.2d at 1122–23 ("We assume that . . . the long-arm statute will be satisfied if Utah's exercise of specific personal jurisdiction over [nonresident defendants] satisfies due process."); *Gardner*, 2012 UT App 45, ¶ 15 ("[We] often assume the application of the [long-arm] statute" and "go directly to the due process prong of the analysis" (first alteration in original) (citation and internal quotation marks omitted)). Adopting that course here, we proceed directly to the due process analysis.

¶12 The Due Process Clause of the Fourteenth Amendment requires a defendant to have "'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Pohl, Inc. of America v. Webelhuth*, 2008 UT 89, ¶ 23, 201 P.3d 944 (alteration in original) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). When a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), courts will generally conclude that due process is satisfied. The nature of the contacts between the defendant and the forum state should allow the defendant to "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

¶13 For purposes of specific jurisdiction, these contacts "must be the basis for the plaintiff's claim." *Arguello*, 838 P.2d at 1123. This analysis focuses the court's attention on "the relationship of the defendant, the forum, and the litigation to each other." *Id.* (citation and internal quotation marks omitted).

¶14 "The United States Supreme Court has suggested two modes of analyzing the question of whether minimum contacts are present: the 'arising out of' test and the 'stream of commerce' test." *Id.* Neither test supports the exercise of specific jurisdiction in this case.

## I. "Arising Out Of" Test

¶15 Under the "arising out of" test, the defendant's contacts must be sufficiently related to the plaintiff's claim so that it can be said that the claim arises out of these contacts. *Arguello*, 838 P.2d at 1124 (providing that when "the contacts of the out-of-state defendant are unrelated to plaintiff's claims, [then] the claim cannot be said to 'arise out of' the contacts with the state"). Ultimately, "due process is not satisfied by the quantity of the contacts with the state, but 'rather upon the quality and nature' of the minimum contacts and their relationship to the claim asserted." *Id.* at 1123 (emphases omitted) (quoting *International Shoe*, 326 U.S. at 319).

¶16 In this case, CMI's contacts with Utah are not related to the claims asserted. Plaintiffs have brought products liability, negligence, and breach of warranty claims against CMI, alleging that it designed, manufactured, marketed, and supplied a faulty magneto that caused the accident in Utah. However, Plaintiffs have not made a prima facie case that these claims arose from CMI's contacts with the state.

¶17 In its ruling, the district court acknowledged that CMI's contacts with Utah "may not give rise to this cause of action" but concluded that they "do relate to the causes of actions alleged herein." The district court identified the following contacts CMI has with Utah: (1) CMI has "fixed base operators" in Utah that have "some association" with CMI; (2) CMI "maintains an interactive website and allows contacts with its headquarters through that website," although the persons "desiring to communicate with [CMI] must initiate that contact"; and (3) CMI

"supplies literature to those who request it, ships parts to Utah, and receives money from Utah customers."

¶18    None of these contacts are suit-related. There is no allegation that CMI's fixed-base operators played any role in the accident or had any connection to the helicopter or the allegedly defective magneto. Plaintiffs have not suggested that anyone in Utah initiated contact with CMI through its website, much less that such contacts were related to or contributed to the accident. And nothing in the record suggests that the accident was caused by parts CMI sold in Utah, by literature CMI distributed in Utah, or from any of CMI's revenue-generating activities in Utah.

¶19    The facts of this case are similar to *Arguello*, in which the Utah Supreme Court held that Utah lacked specific jurisdiction over a nonresident manufacturer of an allegedly defective product. 838 P.2d at 1125. Arguello was injured in Utah while operating a woodworking machine that had a tendency to allow wood to pop out during operation. *Id.* at 1121. The manufacturer sold the machine to a third party in another state who ultimately resold the machine to Arguello's employer in Utah. *Id.* At the employer's request, the manufacturer sent a representative to Utah to advise on the problem of wood being ejected from the machine. *Id.* Other than that visit, the manufacturer's contacts with the state were limited to selling parts to Utah residents for other machines and advertising "the availability of parts for its machines in national trade publications that possibly reached Utah." *Id.* at 1123. The court determined that these contacts were "unrelated to the plaintiff's claims, and the claim cannot be said to 'arise out of' the contacts with the state." *Id.* at 1124.

¶20    CMI's contacts with Utah are even further removed from the subject of the suit than the contacts determined to be insufficient for specific jurisdiction in *Arguello*. There, the manufacturer sent a representative to Utah to inspect the very machine involved in the accident and to advise on the very issue that allegedly caused the injury. Nonetheless, the supreme court

held that the claim could not be said to have arisen from the representative's visit, "because the representative did not undertake to make any changes or repairs to the machine related to the problem that allegedly caused Arguello's injury." *Id*. at 1123. In other words, while the manufacturer had contact with Utah related to the product, that contact did not give rise to the injury. *Id*. at 1123. Here, there is even less connection between CMI's Utah contacts and the injury. CMI had absolutely no contacts with Utah related to the allegedly defective magneto, the engine, or the helicopter, let alone contact that gave rise to the injury.

¶21    While Plaintiffs have made a prima facie case that CMI engages in some continuous activity within Utah, that activity is not suit-related and cannot form the basis for specific jurisdiction.

## II. "Stream of Commerce" Test

¶22    The "stream of commerce" theory of specific jurisdiction developed in product-liability cases to address the situation where "the seller does not come in direct contact with the forum state but does so through intermediaries such as retailers or distributors." American Law of Prods. Liab. 3d *Stream of commerce theory* § 48.85 (2017). "Typically, in such cases, a nonresident defendant, acting outside the forum, places in the stream of commerce a product that ultimately causes harm inside the forum." *Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 926 (2011) (emphasis omitted). Under this theory, if the sale of a product "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States," then "it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

¶23   In this case, the "stream of commerce" analysis fails for two reasons. First, CMI did not place the magneto into the stream of commerce for distribution but sold the magneto as a component part to an end user outside of Utah. Second, even if the "stream of commerce" theory applies, there is no evidence that CMI took any additional steps to target Utah for the sale of the product that is the subject of this suit.

¶24   "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Asahi Metal Indus. Co. v. Superior Court of Cali.*, 480 U.S. 102, 117 (1987) (Brennan, J., concurring in part and concurring in the judgment). Once a product has reached the end of the stream of commerce and is purchased by a consumer, a third party's unilateral decision to take the product to the forum state is insufficient to confer personal jurisdiction over the manufacturer. *See* American Law of Prods. Liab. 3d *Stream of commerce theory* § 48.85 (2017).

¶25   The Utah Supreme Court encountered a similar factual scenario in *Arguello*, where the woodworking machine at issue was originally sold by the manufacturer to a California company, which had requested customized features and paid sales tax on the order. *Arguello*, 838 P.2d at 1121. The manufacturer argued that "the machine never entered the stream of commerce because it was sold to an ultimate buyer and resale of the machine in Utah was wholly unforeseeable." *Id.* at 1125. The court agreed that the manufacturer "never attempted to enter the machine into a stream of commerce that ran to Utah." *Id.* The machine arrived in Utah "due only to the unforeseeable sale" by a third party, "not from any deliberate action by defendant." *Id.*

¶26   Similarly, the magneto did not arrive in Utah due to any deliberate action on the part of CMI but instead through a series of third-party sales. There is no evidence to suggest that the original sale of the magneto occurred in Utah, either through

CMI or a distributor. The record reflects that, in 2011, the magneto was in the possession of Aircraft Electrical, a California company, which overhauled it and transferred it to Nevada Aircraft, a Nevada company. Nevada Aircraft installed the magneto into an overhauled engine, which it sold to Upper Limit Aviation in Utah. As CMI asserts, the magneto "did not enter Utah as a result of any direct or indirect action of CMI or as a result of any conduct by CMI purposefully directed at Utah" but "as a result of the actions of Aircraft Electrical and Nevada Aircraft." Because this case does not involve the movement of manufactured goods through distribution channels to retail sale in the forum state, there is no "stream of commerce" connection to support personal jurisdiction.

¶27    In any event, merely placing a product into the stream of commerce knowing that it could be swept into the forum state does not subject a manufacturer to personal jurisdiction. The stream-of-commerce theory "does not amend the general rule of personal jurisdiction," which requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 880, 882 (2011) (citation and internal quotation marks omitted). To satisfy the purposeful-availment requirement, "the defendant must have taken deliberate steps to serve the forum state market with the product that is the subject of the suit before being susceptible to jurisdiction in that state." *Arguello*, 838 P.2d at 1124. In other words, "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Nicastro*, 564 U.S. at 882.

¶28    In the present case, there is no evidence in the record that CMI took "deliberate steps to serve the forum state market with

the product that is the subject of the suit." *See Arguello*, 838 P.2d at 1124. The district court found that CMI transacted business in Utah—including maintaining an association with fixed-base operators, supplying literature to Utah residents on request, and shipping parts to Utah—but there is no evidence that these activities related to the allegedly defective product. Plaintiffs have produced no documentary evidence to show that CMI regularly sells magnetos in Utah, much less that it targeted the Utah market with a state-specific design, advertising, or customer support for magnetos. *See Parry v. Ernst Home Center Corp.*, 779 P.2d 659, 666 (Utah 1989) (holding that there was no specific jurisdiction over a manufacturer of a maul that caused an injury in Utah where the record did not contain "the number or percentage of mauls manufactured which were actually sold in Utah" or any evidence of "special designing for Utah's market, advertising in Utah, establishing channels for providing regular advice to customers in Utah, or marketing the product through a distributor who has agreed to act as a sales agent in Utah"). In fact, the record does not establish a single sale, communication, or other contact related to magnetos between CMI and any Utah resident.

¶29  In determining that it had personal jurisdiction, the district court relied on CMI's general business activities in Utah, rather than any activities related to the subject of this lawsuit. In doing so, the court's "stream-of-commerce analysis elided the essential difference between case-specific and all-purpose (general) jurisdiction." *See Goodyear*, 564 U.S. at 927.

¶30  In *Goodyear*, the United States Supreme Court clarified that the stream-of-commerce theory is "germane to *specific* jurisdiction." *Id*. "But ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant." *Id*. "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues

deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* at 919 (citation and internal quotation marks omitted). The lower courts in *Goodyear* confused or blended the general and specific jurisdiction inquiries so that "any substantial manufacturer or seller of goods would be amenable to suit, on any claim for relief, wherever its products are distributed." *Id*. at 929. But a manufacturer's "'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to the activity.'" *Id.* at 927 (quoting *International Shoe Co.*, 326 U.S. at 318). When there is no connection between the forum and the underlying controversy, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Court of Cali.*, 137 S. Ct. 1773, 1781 (2017).

¶31    Here, it is undisputed that CMI has not engaged in the type of substantial and continuous activity in Utah that would subject it to general jurisdiction. While CMI's limited in-state activity could potentially give rise to specific or case-related jurisdiction, there is no support for the district court's conclusion that "this litigation results from injuries that relate to those activities." Because Plaintiffs have not shown that CMI's activities in Utah are related to the subject matter of the lawsuit, there is no basis for the exercise of specific jurisdiction.

CONCLUSION

¶32    The record does not establish that CMI has suit-related contacts sufficient to give rise to personal jurisdiction in Utah. As a result, we vacate the district court's order denying CMI's motion to dismiss. On remand, the district court may, in its discretion, entertain the Plaintiffs' alternative motion for jurisdictional discovery.

———————